Filed 11/19/13; mod. and part. pub. orders 12/19/13 (see attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GAMALIEL ELIZALDE et al.,<br><br>        Defendants and Appellants. | A132071<br><br>(Contra Costa County<br>Super. Ct. No. 050809038) |

## I.  INTRODUCTION

This case involves four victims:  Antonio Centron, Luis Perez, Lisa Thayer and Rico McIntosh.  Defendant Javier Gomez was found guilty of the second degree murder of McIntosh and the jury found true enhancements for participating in a criminal street gang and intentionally discharging a firearm causing bodily injury or death.  A second jury found defendants Mota and Elizalde[1], guilty of the first degree murder of Centron, Perez and McIntosh and came back with an acquittal as to Lisa Thayer.  The jury also found Mota and Elizalde guilty of conspiracy to commit murder, participating in a criminal street gang and found true enhancements for participating in a criminal street gang.  As to Mota, the jury found true an enhancement for intentionally discharging a firearm causing great bodily injury or death.  Elizalde was also found guilty of dissuading a witness by force or threat of force.

---

[1] Because Gomez confessed to one of the murders and implicated Mota, the court ordered a single trial with two juries:  one jury for Gomez and the second jury for Mota and Elizalde.

1

On appeal, Gomez argues that (1) the trial court had a sua sponte duty to instruct the jury that an unforeseeable supervening cause might have caused Rico McIntosh's death (Elizalde and Mota join in this argument); (2) the trial court did not properly answer the jury's questions regarding the elements of second degree murder (Elizalde joins in this argument); (3) the trial court erred in permitting testimony regarding threats to witnesses (Elizalde and Mota join in this argument); and (4) the trial court erred when it failed to instruct the jury that witness Oscar Menendez was an accomplice as a matter of law (Elizalde and Mota join in this argument).

Mota argues that the trial court erred when it (1) found that there was no prima facie case of discrimination with regard to an African-American prospective juror (Gomez and Elizalde join in this argument); (2) gave the jury the task of determining whether four witnesses were accomplices (Gomez and Elizalde join in this argument); (3) admitted into evidence a statement Mota made during booking regarding his gang affiliation (Gomez and Elizalde join in this argument); (4) instructed the jury not to speculate about why unjoined perpetrators were not tried in the same trial (Gomez and Elizalde join in this argument); and (5) admitted evidence that Mota attacked Jorge Sanchez in jail (Gomez and Elizalde join in this argument). He also argues that (6) during his rebuttal to the defense's closing argument, the prosecutor committed misconduct (Gomez and Elizalde join in this argument); and (7) there was cumulative error.

Elizalde contends on appeal that (1) there is not substantial evidence to support the jury's conspiracy finding (Gomez and Mota join in this argument); (2) the trial court failed in admitting phone calls between Hector Molina and his mother under the co-conspirator exception to the hearsay rule (Gomez and Mota join in this argument); (3) trial counsel was ineffective for failing to seek redaction of a statement Elizalde made to Molina's mother during one of these jail calls; (4) the trial court erred when it instructed the jury, pursuant to CALJIC No. 3.13, that the required corroboration of the testimony of an accomplice may not be supplied by the testimony of any other accomplice (Gomez and Mota join in this argument); (5) the trial court erred when it admitted evidence that

2

Elizalde possessed methamphetamine for sale to prove a predicate offense for the gang charge and enhancements (Gomez and Mota join in this argument); (6) counsel was ineffective for failing to object to other crimes evidence regarding the conspiracy to commit murders (Gomez and Mota join in this argument); and (7) there was cumulative error.

With the exception of the admission of Mota's un-*Mirandized*[2] statements made when he was booked into jail, an error that was not prejudicial, we find no other error and affirm the judgments.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.     *The Murders*

Defendants Mota and Elizalde were convicted of three murders that occurred over a four-month period between December 22, 2007, and April 25, 2008.  Gomez was convicted of one of the three, that of Rico McIntosh.  The most significant testimony regarding these murders came from fellow gang members and/or friends, Jorge Sanchez (Centron murder), Victor Cervantes (Centron murder), Oscar Menendez (McIntosh murder), and Larry Valencia (Perez murder).

#### 1.     *Antonio Centron Murder*

Jorge Sanchez testified that in exchange for his testimony he pled to accessory after the fact to murder, and received a three-year suspended sentence.  Sanchez, who was not in the country legally, also had a "parole in place" arrangement with Immigration and Customs Enforcement and, as a result, wore an ankle bracelet monitor.  Sanchez testified that he was a member of Varrio Frontero Loco[3], a subset of the Sureño gang, which is active in Contra Costa County.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[3] As one of the prosecution witnesses explained, Varrio Frontero Loco "just stands for it's a hood, you know, no matter from where country you are from, you are in the hood."

The evening of December 22, 2007, Francisco Romero , who was also a Varrio Frontero Loco, gathered together a number of people and went to North Richmond.[4] When he arrived, Molina phoned defendant Gamaliel (Gama) Elizalde[5] "because supposedly he was going to put a meeting to go up there, just fight them [the Richmond Sur Trace members]." After speaking to Romero, Elizalde came to North Richmond. Elizalde then tried to call a Richmond Sur Trace member in order to arrange a fight but was not able to reach anyone.

After the failed effort to engage the Richmond Sur Trace, Sanchez, Romero and Molina eventually drove to the Broadway area of San Pablo, which was known to be Norteño territory. Sanchez understood that if they found Norteños there they would beat them up or shoot them. He understood this "was part of the deal of being a . . . [Varrio Frontero Loco] Sureño at this time."

That same evening, the victim, Antonio Centron, along with two friends, Neil Wixson and Adrian Espinoza, attended a party in the Broadway area of San Pablo. They stayed at the party for a couple of hours and then walked down Lake Street, toward 19th Street to buy beer. This area of San Pablo was a stronghold of the Norteño gang. Wixson and Centron wore red shirts, a color associated with Norteños. Centron walked a little ahead of his friends.

Romero drove by Centron, Wixson and Espinoza. Molina, who was in the right front passenger seat, told Romero he knew one of the three men. Molina pulled out a handgun and directed Romero to park down the next street. Romero parked and Molina ran out, and hid behind a fence, waiting for Centron, Wixson and Espinoza to come to the corner. When they did, Molina told them he was "VFL" and emptied his gun in their

---

[4] Preceding this gathering, there had been altercations between members of Varrio Frontero Loco and another Sureño gang called Richmond Sur Trace as well as with rival Norteño gang members.

[5] We identify the witnesses, victims, defendants and other participants in this trial by their full names rather than their gang nicknames. Where necessary for clarification, we will indicate the full name of any person identified in testimony solely by his gang nickname.

4

direction. His first shot hit Centron in the head. Centron died almost immediately. Nine more shots hit Espinoza in the back. Molina's final shot hit Wixon in the arm. Espinoza, who was still conscious (and ultimately survived his injuries) called 911.

After killing and wounding the men he believed were rival gang members, Molina ran back to the car and they sped off. In the car, Molina was jumpy and excited. According to Sanchez, Molina said "to watch the newspaper. That's—that was going to be his trophy." A newspaper article about a killing was "[l]ike a signature that you did it." The killing would give Molina "more respect" in the gang. Molina called Elizalde to tell him what he'd done. Elizalde arrived "and just started telling him just be quiet, stop, you know, screaming and just lay low."

The next day, the police detained and searched Molina. They found in his possession a .45 caliber chrome Colt semiautomatic handgun, a blue bandana, and a blue baseball hat. The police arrested him and charged him with possession of a concealed firearm. Molina was released from jail four days later.

Victor Cervantes testified that right after Molina got out of jail, he called Cervantes and asked for a ride home. Molina told him that he'd killed one man and another was in a coma. He also told Cervantes that he'd been with Francisco Romero when he'd killed the man. Cervantes asked him how he got out of jail when he'd been caught with a gun. Molina told him that he got caught with a different gun than the one used in the killing and, as a result, he had gotten away with murder.

In an interview with the police, Luis Ruelas testified that Molina admitted to him that he was in the car with Romero and Sanchez that evening and that Molina said he had shot at three men and killed one of them.

Defendants Elizalde and Mota were found guilty of Centron's murder as co-conspirators.

### 2. *Luis Perez Murder*

Larry Valencia was one of the prosecution's main witnesses with regard to the murder of Luis Perez. Valencia had not made a plea bargain with the District Attorney's

5

office, nor was he receiving any witness protection or money from the District Attorney's office.

Valencia testified that late on the night of February 16, 2008, he decided to visit friends in North Richmond. After an evening of drinking beer, smoking marijuana and taking Ecstasy someone said, "[l]et's jump for a ride. Let's go find some females to party." Hector Molina, Jorge Camacho, and Jose Mota got into Mota's black, two-door Kia. Molina sat in the driver's seat, with Jorge Camacho next to him in the passenger seat and Mota in the back. Cole Azamar and Luii Hernandez got into Azamar's car, with Azamar driving and Hernandez sitting in the passenger seat. All five men were members of Varrio Frontero Loco. They encouraged Larry Valencia (who testified that he was not a gang member) to join them and he got into the back seat of Azamar's car. After the two cars drove around for a while, with Azamar following Molina, they arrived in San Pablo. Valencia was aware that this was Norteño territory.

Molina stopped the car and Valencia saw the people in Mota's car arguing with a man in a red jacket—the victim, Luis Perez—who was standing next to the car. He saw Camacho get out of the car and say to the man, "[s]how me your hands, show me your hands." The man yelled "[w]hat the fuck is going on?" Valencia heard three loud shots and saw Camacho shoot the man three or four times. In fact, Camacho hit Perez seven times: two bullets to the abdomen, two to the back and three to the back of his arms. The bullets passed through Perez's lungs, heart and liver. Perez died en route to John Muir Hospital in Walnut Creek.

Camacho got back into the car with Molina and Mota and Molina drove away. Valencia had never seen anyone killed before. Valencia told Azamar to take him back to his car so he could go home.

Mota was found guilty of Perez's murder on an aider and abettor theory. Elizalde was found guilty as a co-conspirator.

### 3. *Lisa Thayer*

The third victim, Lisa Thayer, died when Jorge Camacho, a member of Varrio Frontero Loco, exchanged shots with several unidentified men in a Toyota minivan.

6

This altercation began late in the afternoon of February 27, 2008. Camacho and his friend Antonio Solomon, were walking on San Pablo Avenue in San Pablo.[6] Solomon was wearing a New York Yankees hat. In that area, that kind of hat was understood to stand for "Young Narfer," a reference to North Richmond, which was Sureño territory.

A burgundy Toyota minivan with a Hispanic driver and front seat passenger and African-American passenger in the back seat passed Solomon and Camacho. Solomon and Camacho ran.

The men in the minivan chased them. Eventually, the minivan pulled up behind Solomon and Camacho. The side door opened, revealing that the back seat passenger had a gun. Camacho shot at the van with the same 9 mm semiautomatic handgun he used to kill Perez. He fired nine times. The man in the van also fired a .40 caliber semiautomatic handgun several times.

Lisa Thayer, who was walking on San Pablo about half a block from the shooting, was hit by a bullet. The bullet hit her in the back, went through her right lung and came out at her chest. Thayer died soon afterwards.

Solomon and Camacho ran from the scene with the van following them. Someone in the van fired several more shots at them. Soloman and Camacho climbed a fence and ran to the apartment of a friend—Ignacio Mendoza. When Mendoza's mother told them to leave, Camacho gave his gun to Mendoza and left with Solomon. The police arrived nearby, a witness pointed them out and they were arrested. Camacho had a blue bandana in his pocket.

The jury found defendants Mota and Elizalde not guilty of Thayer's murder.

### 4.      *Rico McIntosh*

The fourth shooting occurred in the early morning hours of April 26, 2008. Oscar Menendez, who was present at the shooting, testified that he had pleaded to accessory to the murder of McIntosh with a gang enhancement. He was given three years probation.

---

[6] Much of the evidence regarding this incident came from an interview between Solomon and the police.

As a condition of his plea, he agreed to testify in court. At the time he testified he was in "parole in place," which meant he wore an ankle monitor required by Immigrations, Customs and Enforcement. The People were assisting him in obtaining a work permit. Menendez had not violated any of the terms of his probation or the terms and conditions imposed by Immigration, Customs and Enforcement. He did not receive any money from the District Attorney's office.

Menendez testified that he had known Mota for several years. Mota was a member of Varrio Frontero Loco. Menendez also knew Javier Gomez. The three of them hung out together and "sometimes we used to get in the car and just cruise around." Gomez belonged to a Sureño subset called Mexican Loco.[7] Menendez had been at parties where members of the two Sureño subsets would brag "about crimes they have done during the week or, you know, any stuff that they doing, you know, like beating somebody up or robbing people or whatever crimes they do, they used to brag about all of the time." Six months before the McIntosh murder, Menendez became a Sureño.

Menendez described an incident that occurred about a week and a half before the McIntosh murder. He, Gomez and Mota went to visit Gomez's cousin who lived in Montalvin, which was Norteño territory. Mota drove his Kia, and Gomez sat in the front passenger seat. Menendez sat in the back. The cousin wasn't home, so they turned around to return to Richmond. As they did so, Gomez and Mota saw a man wearing red who was fixing his car. Mota and Gomez "said he was a Buster. He was wearing red . . . ." Menendez didn't agree and when he saw that Gomez and Mota had a gun[8] in the front seat he told them to drop the gun. Menendez tried to grab the gun and in the ensuing scuffle, someone shot Menendez in the leg.

---

[7] During a search of Gomez's home, the police collected evidence of Gomez's gang membership—four CD cases with "Sureño-type titles on them," "six individual CDs with Sureño-type titles," "[a]nother CD . . . again, with Sureño-type titles," "[t]wo blue bandanas."

[8] Menendez had found this gun earlier, but he gave it to Mota when Mota told him that he (Menendez) couldn't shoot it and "might as well just give it to him . . . ."

Menendez was bleeding heavily, so Mota and Gomez took him to the hospital. The police questioned Menendez and he lied and told them that they had been jumped and he had been shot in the leg because he told his assailants that he didn't have any money.

Several weeks later, Gomez and Mota pulled up to where Menendez was hanging out with some friends and "they were calling me, right, and I went to the car and they say get in the car. I was like where are you guys going? They said don't trip." As on the other occasion, Mota was driving and Gomez was in the front passenger seat. Menendez asked if his friend could go too, and Mota told him he couldn't. Menendez got in the car and they decided to go to a McDonald's on San Pablo near Broadway. Instead of turning right into the McDonald's, however, Mota turned left onto Broadway. Menendez asked Mota were he was going and he said "don't trip." Mota kept driving. At this point, they were driving into Norteño territory and Menendez thought "they were looking for some Norteños . . . or they were trying to do something again."

Gomez spotted three men wearing red at a stop sign. Mota stopped the car and asked the men if they were "busters." The men said they weren't, and Menendez recognized one of them and told Mota that "they don't bang . . . ." Mota drove away but "he kept on mugging[9] them."

Mota then spotted Rico McIntosh, who looked, to Menendez, like he was wearing a red bandana and had some "red on his pants, too." Mota and Gomez thought he looked like a Norteño. They pulled alongside McIntosh and Gomez asked him "if he is a buster." McIntosh said "what the fuck is a buster?" Menendez thought he heard Mota say "pull it out." He then saw Gomez reach down toward his leg. McIntosh made a gesture as though to reach for something and Menendez thought it was a gun. Gomez began to fire the gun out of the window of the car. Menendez heard four or five shots. McIntosh fell and Mota and Gomez began to laugh. Menendez told them it wasn't funny and they told him he was a "pussy." Menendez said he wanted to go home. "I told them

---

[9] Menendez defined "mugging" as "like he look hellabad at him."

9

what they just did, it was wrong because I never seen somebody kill another person like that."

Mota and Gomez "seemed pretty happy, like they just won the lottery or something. They were really excited about it." Mota and Gomez wanted to celebrate, but Menendez asked to go home. On the way, Mota and Gomez talked and said, "Oh, you know, what the homies are going to say when they find out, or was he good, was he bad, you know they were saying that it was like, you know, it was like perfect. Perfect is no one sees them. [¶] No one seen us when we were there. When that happened there was no people at all, just that guy."

When they arrived at Menendez's house, Mota left the gun with Menendez. He told Menendez that he was on parole and couldn't have it.

A week or so later, Menendez went to a party with members of Varrio Frontero Loco and Mexican Loco. At the party, Gomez "started talking about it." Ruelas was also present, along with a number of other Varrio Frontero Loco and Mexican Loco. Mota was also there.

Gomez confessed to the McIntosh murder. He told the police that Mota picked him up the night of the murder and the two of them went to look for Norteños. Mota gave him the gun he used to shoot Rico McIntosh. Mota's job was to drive until he saw a Norteño and then stop. Gomez didn't plan to shoot anyone who wasn't a Norteño. After driving around for a while Mota and Gomez picked up Menendez. Menendez sat in the back seat. They continued to look for Norteños, slowing down to look and then ruling out a number of groups of people who were out that night. Eventually, either Mota or Menendez spotted McIntosh, who was walking down the street. Mota told him that McIntosh had some red on. Gomez "asked him, are you a Buster? And he said, what the fuck is a buster? He, he had a hoodie. Then he like, he pulled the hoodie down as if he wanted to do something, so I just shot him." He shot McIntosh until there were no bullets left in his gun.

After the shooting they went to a store and bought some beer and drank it at the cemetery. He gave the gun to Menendez. Menendez saw the whole thing from the backseat.

McIntosh was hit in the hip and buttocks. He was taken to John Muir Hospital and released on April 28, 2008. The next day, McIntosh collapsed and died after blood clots caused by the gunshot wounds traveled to his lungs.

Gomez was convicted of second degree murder. Mota was convicted of first degree murder as an aider and abettor and Elizalde was convicted as a co-conspirator.

**B.** *Conspiracy and Gang Evidence*

Several witnesses testified to a conspiracy on the part of Mota and Elizalde to commit murders of rival Norteño gang members in order to restore the reputation and fortunes of the Varrio Frontero Loco.

1. *Jorge Sanchez*

Jorge Sanchez was a member of Varrio Frontero Loco.[10] He joined because his older brother was in the gang. Sanchez's brother was a member of the Mexican Loco, another Sureño gang, and he joined the Varrio Frontero Loco because he wanted his own "name." He was "jumped in" to Varrio Frontero Loco, through a process he described as "[j]ust imagine three guys beating on one person, kicking him, beating him, just thumping on him" for 13 seconds. He had also helped jump people into the gang. Sanchez showed the jury a number of tattoos that signified his membership in Varrio Frontero Loco. Gang tattoos were important so people "won't mess with us."

A Sureño who wanted to prove himself would "[j]ust go to the streets. Beat up any Norteño you can think of to start with. . . . [¶] Just you earn respect and your stripes. Start shooting or just doing whatever you want." You would do this with other people "[t]o make sure you do it. Just to make sure you ain't lying about what you did." When

---

[10] Of the witnesses who provided significant testimony regarding the workings of the Varrio Frontero Loco and Elizalde and Mota's positions and participation in the gang, Sanchez was the only one the court concluded was an accomplice as a matter of law. Accordingly, the jury was instructed to view his testimony with caution.

Sanchez went out to attack Norteños, he would take fellow Varrio Frontero Loco with him. He would do that for "backup." He would also do it to "make sure they do it, too. Make sure they look at you."

Sanchez understood that at the time of trial, Mota and Elizalde had "green lighted" him; that is, they had ordered him killed for talking to the police. Green lighting did not occur until the actual text of a statement made to the police was distributed "to the streets," generally through a defendant who received the statement from his lawyer.

Sureños were enemies with Norteños because they were "mixed people": "part Mexican . . . they mix with Mexican black, Mexican white." You could tell who they were by "[t]he hair, the clothes, the grill that is like the gold teeth they wear. [¶] And if they got tattoos you look at tattoos, belts." In particular, Norteños had long hair, "all of the new clothes the black people be coming out with," and wore the color red, including red belts. Sureños identified themselves with blue bandanas and blue belts.

Sanchez was familiar with a number of Norteño sub-gangs including West Side Berkeley, Montalvin, Varrio San Pablo. Each of them claimed a particular area. Varrio San Pablo claimed the area near Broadway and the Hilltop Mall.

As a Sureño, when he saw a Norteño he was supposed to "[t]ake off, just don't even think about it, just hit them up. . . . Just whoop his ass."

Varrio Frontero Loco used violence to scare "[j]ust the people, Norteños whoever—everybody, the blacks, the whites, the Asians." They did so "[j]ust so they won't mess with us. . . . [P]eople be picking on people. Sometimes people just look for a way out. And just make sure they scared of you instead of you being scared of them."

Fame mattered because it was a way of "representing my hood," "[j]ust to let people know . . . where you are from." You did that by "doing a lot of things, shooting, selling drugs, getting money, cars, just whoop—whooping people in front of other people." A Varrio Frontero Loco would "throw it up" by telling someone who they were, just make sure they know it. Being feared by rival gang members was a good thing— "[y]ou can be walking the streets with no one, no one is trying to hit you up or something."

12

Gang members would get together and brag about what they had done in order to let people know that "if they mess with you they will get the same . . . treatment." He would also get together with other Varrio Frontero Loco and plan future crimes "to get respect or to make people afraid."

With regard to non-gang members, it was important to "let them know that . . . we don't mess with you and you just don't mess with us."

Drug sales were a part of being a Varrio Frontero Loco. Sanchez "wasn't into that," but he had seen fellow gang member Gamaliel Elizalde selling drugs out of his backyard. He would sometimes give drugs to Mota to sell and Mota would brag about it. The drug sales were run out of Elizalde's house.

Varrio Frontero Loco held meetings to "check in with each other, to make sure what was going on with each other and just what kind of problems, like people got problems with someone, different rivals or with a Norteño or something." Sometimes the members would put money together for people in jail to use for "hygienes like toothpaste, soap, shampoo . . . ." Elizalde was in charge of putting money "on the books" for the Varrio Frontero Loco members who were in jail. The meetings were not held often. Sometimes the meetings would take place at Victor Valencia's house and sometimes at Elizalde's house.
Occasionally, he and other members would "check," or beat up, a member who was not "putting in work or he ain't kicking it with us a lot . . . ."

At the time Sanchez joined Varrio Frontero Loco in 2005 or 2006, it was led by a number of men, including Gamaliel Elizalde. Elizalde was an "OG"[11] or leader, "the one you look up to. . . . The one[] that you go ask for advice." One of the benefits of being a leader was that he "get to kickback or just don't do a lot of things no more." A leader

---

[11] Sanchez explained that "OG" meant "[j]ust like an old Cadillac, like an older guy, just the one who is like forties, thirties, forties." You get to be an "OG" by going "through a lot . . . . They went through their stages, just like we went through our stages, we going through our stages. . . . [¶] . . . [T]hey know more stuff than we do. They got more opportunities in their brain."

would not "fight somebody or put a lot of work in the streets, shooting, whatever, just get to just relax and let the other generation do their work."

A leader would have money from "things going on on the side . . . . [¶] . . . like they were selling drugs . . . ." The leaders would use the "pee wees" or younger members "to distribute it. . . ."

In 2007, there were several subsets of Sureños with whom Sanchez was familiar: his own gang, Varrio Frontero Loco, another gang called Mexican Loco and a third called Richmond Sur Trece. Although they were all Sureños, they did not always get along. In 2007, a Varrio Frontero Loco leader called "Toby" shot a member of a Richmond Sur Trece and fled, along with his brothers, to avoid being killed in retaliation for murdering a fellow Sureño. This left a void in the leadership of Varrio Frontero Loco, which was filled by Elizalde. As Sanchez put it, after Toby fled, "everybody was just going to Gama, so that's the only one who we look up to and who was there with us." Nevertheless, after Elizalde took over, Varrio Frontero Loco began to dissolve. "[E]verybody just try to take it their own way. It was—just disappeared. Some of them went to some other towns. People got scared because they got shot at, who was getting stomped on." At this point, Varrio Frontero Loco were "getting hurt" and "things were bad."

Sanchez testified that "we just had to get it back together." He and others referred to this as "bring[ing] the hood back." To do this, it was necessary to "recruit[] new people and try to do more damage to the Norteños, to the streets." All of the Varrio Frontero Loco wanted to bring the hood back, including Elizalde. In terms of the hierarchy of Varrio Frontero Loco, Elizalde was the leader, and Sanchez was directly under him along with Mota, Ruelas, and several others.

Elizalde told the Varrio Frontero Loco that they had to "put in more work," "go to the streets, ride around the streets," "[m]ake sure they [the Norteños and everybody] know we around, we ain't gone." They would do this by "hit[ting] the streets, ride around, especially in Norteño territory." Sanchez explained that this was effective because the Norteños "don't expect us to go. They think we going to be scared. They

14

think we going to just lay back.  And we go there and they go, oh, man, they coming back and they coming back hard."  In Norteño territory, [i]f you see them just shoot them or whoop them, whatever you got.  If you don't got no gun you just get out and do what you got."

Sanchez discussed this plan with all the Varrio Frontero Loco, including Mota.  He didn't talk to Elizalde about why he wanted to bring the hood back; he only knew that Elizalde "wanted it done."

According to Sanchez, he and Mota, along with Luis Ruelas, Luii Hernandez, and Cole Azamar were "the ones who was going to bring them back . . . just the ones who got to take care of everything."  They covered different parts of Richmond.  In addition to attacking Norteños, they also recruited and "guided" "pee wees."  Elizalde wanted them to "get into the high schools and expand the Sureños and hurt the Norteños."

Shortly before Sanchez was arrested, Mota came to his house.  He was nervous because the police had been to his house.  Mota told him that he [Mota] "went in the shootout."  He also spoke to Jorge Camacho who told him that he "shot a lady."

### 2.    *Oscar Menendez*

Oscar Menendez testified that at the time of the Rico McIntosh murder, he "was undecided" about being a Varrio Frontero Loco.  He "didn't want it for my future . . . it was just fine being with them, you know, being with girls and having parties, but I didn't like the rest that they used to do."  He had a lot of Sureño mentions on his MySpace page, and he liked being around the gang because it "was fun because they always used to hang around with a lot of girls and they always used to have parties every weekend and, you know, beers and music."

He was aware that gang members "hunted and attacked Norteños."  However, no one ever "told me to do it."  He was never "jumped in."  He associated with the Varrio Frontero Loco for six or seven months beginning in November 2007 until his arrest about a week after the McIntosh murder.

It was typical for gang members to brag about their crimes.  He explained, "they say that's what they get respect because when they—when the rest of the guys knew what

15

you were doing they will respect you more than what they do." This was a "big deal" to the Varrio Frontero Loco.

The Norteños were the Varrio Frontero Loco's rivals. Menendez knew what areas were Norteño territory. He also knew that if a Varrio Frontero Loco found a Norteño or saw one he was to "beat him up and if you have a gun you have to use it." That is because the Varrio Frontero Loco "wanted to get rid of Norteños."

He knew both Javier Gomez and Victor Cervantes, both of whom were members of the Sureño gang, Mexican Loco. When he associated with these gangs he knew they got along "but not that much" at first.

According to Menendez, Varrio Frontero Loco "wasn't that much organized." He "never knew who was the shot-caller . . . ." He was aware that the members "used to receive orders from some older guys . . . ." When he asked what they were doing, the members would say "don't trip . . . that's something that I got to do and that's it." In his own mind, he thought that Elizalde was the shot-caller because he once heard him giving orders to someone. At one point, Elizalde told Menendez that "in order to be a Sureño you have to get down, you now, don't have to be a fear of anybody, if you see a Norteño on the street you have to put him on check, beat him up or anything that is in your hands to get him away from Richmond, and to don't let them come to Richmond, let them stay in San Pablo." Specifically Elizalde told him that if he saw a Norteño he was to beat him up and if he had a gun to use it. Elizalde once told him that in order to be a Sureño he had to "stick with them all the time and commit sort of a crime that he used to commit—I had to do the crime that they used to do in the week and stick around with them and, you know, do whatever they—they were doing during the week." This would include "[s]tealing cars and robbing people, shooting Norteños, beat them up." Mota told him the same thing. He also told him that he had to "earn" a Varrio Frontero Loco tattoo by doing something "big" like kill a Norteño.

On three occasions, he heard Elizalde instruct someone to beat up a Norteño or to look for him. He also heard Elizalde say that Richmond was Sureño territory.

Menendez named a number of Varrio Frontero Loco as those with the most respect in the gang. They were Molina, Azamar, Camacho, Ruelas and Sanchez. He also knew Larry Valencia, who he didn't think was a gang member.

He felt that he had to do what Elizalde told him to do. He did not, however, think that he had to hunt Norteños in San Pablo. When he went with Mota and Javier Gomez on April 13, 2008, which was the day he shot himself by accident, he did not know that they were looking for Norteños to kill. Nor did he think that was the case on April 26, 2008. He did not realize that they were looking for Norteños to kill until the car did not turn toward the McDonald's on Broadway as he had expected.

In jail, Menendez received a message on the module where he was housed from the Sureño shot caller. The message laid out in detail how he was to behave while incarcerated. Among other things, he was to contribute money to buy food and supplies for other Sureños, he was not to speak to the police, he was to follow orders from the shot caller and if he was asked, he was to beat people up the shot caller told him to attack. He was also required to give the shot caller a copy of the police report on his arrest as well as any other legal materials in order to permit the shot caller to determine whether he was a snitch. Menendez refused to give these materials to the shot caller and, several days later, he was beat up by several Sureños. He entered protective custody afterwards.

### 3.    *Luis Ruelas*

Luis Ruelas testified that he was a member of Varrio Frontero Loco for six years until 2008. He was 14 or 15 when he was jumped into the gang. Jose Valencia brought him into the gang.

Ruelas's testimony before the grand jury was admitted into evidence. In that testimony, Ruelas told the grand jury that he had "earned" a tattoo that said "Chap Killa" on his arm. He worked his way up from the bottom of the gang by earning "respect" through shooting and beating up Norteños. Norteños were identified by the color red, while Sureños wore the color blue. Ruelas became close to one of the top people in Varrio Frontero Loco at the time, Victor Valencia. Valencia had secured their territory by running out another gang that had previously been there.

17

Ruelas was deported to Mexico and Victor Valencia fled the country. When Ruelas returned, Elizalde "was the main—was the kingpin at that time, but everything else was a mess on the streets." Elizalde was "moving all the drugs." With Victor Valencia gone, "[h]e took over all our stuff." Ruelas did not like Elizalde. Elizalde gave orders to kill people, including one occasion when Elizalde told Ruelas to "kill somebody because they popped his tires." He didn't do it because at the time he was working as an informant with the San Pablo police. As part of his deal with the police, he promised not to participate in the commission of any crimes. Elizalde also would send Ruelas out to collect debts using violence.

On one occasion, before he returned to Richmond, Ruelas spoke to Hector Molina, who told him "We miss you . . . . We bringing the hood back." According to Ruelas, "the whole part of being a Sureño" was to "assault or kill Norteños."

Ruelas's testimony at an earlier gang prosecution was also admitted into evidence. At that time, Ruelas testified that violence was an important part of bringing the hood back "[b]ecause if . . . you don't have people be scared of you, they ain't going to respect you. They going to be like, you know, whatever. As long as you show them you really about it, they will think about it twice before they come at you." Violence also helped recruit new members who "seen what we were doing and they knew we had money. We had girls, we had everything. And they wanted it, too, so they started joining in."

At trial, Ruelas was reluctant to testify because of threats to his family. In general, he either outright denied or claimed to forget testimony he had earlier given about Varrio Frontero Loco. At trial, he testified that Varrio Frontero Loco did not have a structure in which there was a shot caller. Instead, there were people he looked up to, including Victor Valencia. Ruelas also had respect for Elizalde because he was his elder.

Ruelas showed the jury tattoos on his forearms that said "Chap Killa." A Chap, he explained, is a Norteño gang member. He had done a lot of crimes to earn the tattoo.

One of the rules of being a Sureño "is just you got to represent yourself the right way." To do that, you had to have respect, which you earned through loyalty. If a Varrio Frontero Loco saw a Norteño he was expected to get into a fight with the Norteño. He

18

would sometimes go out and look for Norteños to find. The Broadway area in San Pablo was one place the Norteños hung out.

He knew Elizalde because they "used to kick it outside his house." Elizalde was a Varrio Frontero Loco. He was older and "some guys came up to him for advice." Although he had earlier told the police that Elizalde was "running the streets," he had done so because "I was just trying to save my life from being prosecuted, but it was—what I said was wrong . . . ." In general, he retracted a number of statements he made earlier in which he had identified Elizalde as the person who had taken over drug sales, the person to whom he would go if he needed a gun quickly, and as having a list of people that needed to be hit. He also did not remember telling the police that Mota brought a pound of methamphetamine to his house along with a gun and said he was going on a drug deal.

**D.** *The Verdicts*

The Gomez jury deliberated for three days and came back with a second degree murder verdict with regard to Rico McIntosh. It found the firearm and gang enhancements true. The trial court sentenced Gomez to an aggregate term of 40 years to life in prison.

After four days of deliberation, the Mota/Elizalde jury brought back guilty verdicts on three murder counts and an acquittal with regard to the death of Lisa Thayer. It also found Mota and Elizalde guilty of conspiracy to commit murder, participating in a criminal street gang and found true enhancements for participating in a criminal street gang. As to Mota, the jury found true an enhancement for intentionally discharging a firearm causing great bodily injury or death. Elizalde was also found guilty of dissuading a witness by force or threat of force. The court sentenced Mota to an aggregate term of 100 years to life. It sentenced Elizalde to an aggregate term of 103 years to life.

This timely appeal followed.

19

# III. DISCUSSION

A. *Unforeseeable Supervening Cause Instruction*

Rico McIntosh's death was caused by a pulmonary embolism 72 hours after he was shot and a day after he was released from the hospital. Gomez argues that the trial court erred because it failed to instruct the jury, sua sponte, that they were required to determine whether actions other than Gomez's—in particular, the decision of his doctors to release him from the hospital—constituted an unforeseeable supervening case. He also contends that the instructions the court gave were inadequate. We disagree.

a. *Factual Background*

McIntosh died at around noon on April 29, 2008, after having been released from John Muir Hospital the morning before. Dr. Ikechi Ogan performed McIntosh's autopsy. Ogan examined two bullet wounds; one was located on McIntosh's right thigh and the other on his left hip. Neither was fired from close range. McIntosh had large hematomas on his thigh and hip where he had been shot. A large blood clot was blocking both of McIntosh's lungs. Ogan determined that this blood clot, which totally blocked the flow of blood, made it impossible for McIntosh to breathe and was the cause of his death. The clot was caused by "complications of the gunshot wound to [McIntosh's] pelvic region" and was the cause of his death.

Ogan testified that in general a doctor would know that blood clots are "very likely when you have injury to the lower body and pelvis." The trial court sustained an objection to defendant's question about whether the doctors at John Muir should have "kept an eye on" McIntosh. Ogan testified that McIntosh's follow-up care at John Muir was not relevant to his determination of the cause of death: "I have no desire to comment on . . . why he was released. [¶] My job was to figure out a cause of death of this gentleman. And I did that with the information I had. [¶] I had enough information from the investigating officers and the sheriff's department to do what I had to do and I did that. [¶] That he was released was not . . . in my control. I had a dead body in front of me. I had to decide what killed this dead body and I did that."

20

When asked if the gunshot wounds would have been fatal "but for" the clotting, Ogan replied as follows: "[T]he best thing that I can say is that I have seen people who have gunshot wounds to an extremity, say a thigh or leg, who died. I have seen people who had a gunshot[] wound to the thigh or leg who didn't die. Same with the pelvis, it all depends on the individual."

**b.** *Discussion*

Gomez does not appear to challenge the instructions the court gave the jury on causation. Rather, he argues that the trial court should have instructed the jury sua sponte that if it found that the decision to release McIntosh was the sole cause of his death (apparently if it was grossly negligent), then it could not find that Gomez was the cause of McIntosh's death.

He is incorrect. The trial court's duty to instruct the jury sua sponte extends only to the general principles of law that are necessary for the jury's understanding of the case. (*People v. Mayfield* (1997) 14 Cal.4th 668, 773.) The court did so by giving the jury the full panoply of instructions on causation.[12] Having adequately instructed the jury, the

---

[12] The trial court gave the jury several instructions on proximate cause. It instructed the jury pursuant to CALJIC No. 3.41 as follows: "There may be more than one cause of death of Rico McIntosh. When the conduct of two or more persons contributes concurrently as a cause of the death, the conduct of each is a cause of the death if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the moment of the death and acted with another cause to produce the death. If you find that a defendant's conduct was a cause of death to another person, then it is no defense that the conduct of some other person, even the deceased person, contributed to the death. It is not a defense to a criminal charge that the deceased or some other person was guilty of negligence, which was a contributory cause of the death involved in the case. Where the original injury is a cause of the death, the fact that the immediate cause of death was the medical or surgical treatment administered or that the treatment was a factor contributing to the cause of death will not relieve the person who inflicted the original injury from responsibility. Where, however, the original injury is not a cause of the death and the death was caused by medical or surgical treatment or some other cause, then the defendant is not guilty of the unlawful homicide [¶] If a person unlawfully inflicts a physical injury upon another person and that injury is a cause of the latter's death, that conduct constitutes an unlawful homicide even though the injury inflicted was not the only cause of death. Or, moreover, that conduct constitutes

21

trial court did not have a duty give clarifying or amplifying instructions unless counsel requested them. (*Id.* at p. 778.) Nor does defendant argue that the instructions the trial court gave were either incorrect or misleading.

Gomez instead argues that the court should have instructed the jury on the application of these principles of causation to the decision by the hospital to release McIntosh and instructed the jury that if it found that the decision to release McIntosh was grossly improper, they could conclude that this maltreatment was the sole source of death.

We disagree. The court's sua sponte duty to instruct on general principles of law does not extend to "pinpoint" instructions. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.) Pinpoint instructions "relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte." (*Ibid.*) Gomez did not request such an instruction and the court had no sua sponte duty to give one.

Therefore, we conclude that the jury was properly and adequately instructed on the principles of causation. Nor does defense counsel's decision not to request such an instruction amount to ineffective assistance of counsel. Given the lack of evidence to support the defense theory that inadequate medical care was the sole cause of McIntosh's death, any request for a pinpoint instruction on this issue would have been unavailing. Moreover, even if the court had given this pinpoint instruction, the result would not have been more favorable to Gomez. Ogan determined that the cause of McIntosh's death was a blood clot that blocked the flow of blood and made it impossible for McIntosh to breathe. The doctor's testimony that the blood clot was caused by "complications of the

unlawful homicide, even if; [¶] One the person injured had been already weakened by disease, injury, physical condition or other cause; [¶] Or, two, it is probable that a person in sound physical condition injured in the same way would not have died from the injury; [¶] Or, three, it is probable that the injury only hastened the death of the injured person; [¶] Or, four, the injured person would have died soon thereafter from another cause or other causes."

gunshot wound to [McIntosh's] pelvic region" established that Gomez's conduct was a substantial factor in causing McIntosh's death. In contrast, there was no evidence to support the defense theory that the decision to release McIntosh was so grossly negligent as to be the sole cause of his death.[13]

**B.    *Jury Question Regarding Second Degree Murder***

Gomez argues that the trial court erred in its response to a question posed by the jury during its deliberations. We disagree.

During its deliberations, the jury sent out the following note seeking clarification: "[R]egarding CALJIC 8.20 [first degree murder] . . . if the act of shooting resulted in a murder and the premeditation was the act of shooting, does this imply a premeditation of murder when murder was the result not the intent?"

The court provided the jury with a typewritten response that first addressed the premeditation or "intent to kill" element of first degree murder:  "Under the premeditation and deliberation theory of first degree murder described in CALJIC 8.20 the defendant must have express malice that is, a manifest intent to kill, as well as premeditation and deliberation before acting."

The court then went on to describe the interplay between the lack of intent to kill and second degree murder: "If you find that the defendant intended to shoot, but did not have the intent to kill, then the resulting death would be a second degree murder on this theory if you find that the death was a natural and probable consequence of the shooting. Please consider this response only in connection with all of the jury instructions as a whole."

---

[13] Although Gomez cites *People v. Roberts* (1992) 2 Cal.4th 271 in support of his argument, this case actually undermines his point.  In *Roberts,* defense counsel requested a pinpoint instruction to the effect that "if the medical care [the victim] received after the assault was so inadequate that it amounted to the sole cause of his death, then he was not the proximate cause of Gardner's killing and was not liable for it."  (*Id.* at p. 311.)  The court's refusal to give this instruction was upheld because, as here, "the record is devoid of any evidence of grossly improper treatment. . . . The jury need not be instructed on a theory for which no evidence has been presented. [Citation.]"  (*Id.* at pp. 312 -313.)

23

Gomez contends that the trial court's statement regarding second degree murder was erroneous because the court did not include the entire definition of second degree murder in its response to the jury. Specifically, he argues that, because the court's response to the jury's question did not mention the third element of implied malice murder, namely that "the act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life" (CALJIC No. 8.31), the response "invited the jury to avoid the question of conscious disregard altogether and find appellant guilty of second degree murder regardless of whether or not he appreciated and disregarded the risk to human life inherent in his actions."

He is incorrect. Penal Code section 1138[14] imposes on the trial court a mandatory "duty to clear up any instructional confusion expressed by the jury. [Citations.]" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212, superseded by statute on other grounds.) "This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.]" (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

The trial court responded to a question about only one of the elements of first degree murder—namely, premeditation. This response was appropriately tailored to the jury's question. Moreover, the court explicitly stated that its response was not intended to encompass all issues related to the crimes of first and second degree murder when it instructed the jury to "consider this response only in connection with all of the jury instructions as a whole."

Gomez does not—indeed, cannot—argue that the court's instructions with regard to first and second degree murder, either initially or after the jury's inquiry, were incorrect. His argument instead is that the court was required to reinstruct the jury on the elements of second degree murder. In other words, defendant's argument is that the court

---

[14] All further statutory references are to the Penal Code, unless otherwise noted.

was precluded from answering the jury's question about an *element* of these crimes without also reinstructing the jury as to all of the elements of these crimes.

In fact, the court did make clear to the jury that its response was intended to supplement rather than supplant its earlier instructions. By charging the jury with the responsibility of considering the instruction as a whole, the court ensured that the jury would not misconstrue its response as revising rather than clarifying the earlier instructions. The jury sought an answer to a limited question. It was given one. Therefore, it is unlikely it would have considered the court's response as redefining the elements of second degree murder.

We reject defendant's argument.

## C. *Threats to Witnesses*

Gomez next argues that the trial court erred in permitting Oscar Menendez, Jorge Sanchez, and Luis Ruelas to testify about threats they received before they testified. However, Gomez also concedes that, under Evidence Code section 780 and *People v. Mendoza* (2011) 52 Cal.4th 1056, 1084-1086, such evidence is admissible to assist in the assessment of a witness's credibility and instead argues that, under federal law, the evidence was inadmissible. (*Dudley v. Duckworth* (7th Cir. 1988) 854 F.2d 967, 971-972.) As defendant acknowledges, we are bound to follow our Supreme Court's ruling on this issue and, therefore, reject this argument. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## D. *Instructions Regarding Testimony of Menendez, Cervantes, Valencia and Ruelas*

### 1. *Menendez*

Defendants argue that the trial court erred when it rejected defendant Gomez's request that the court instruct the jury that Menendez was an accomplice as a matter of law and, instead, allowed the jury to determine whether certain witnesses were accomplices.[15] Accordingly, defendants take issue with a number of instructions given

---

[15] The People correctly point out that Elizalde has waived any objection to the trial court's ruling that Menendez, Ruelas, Sanchez, and Valencia were not accomplices as a

by the trial court regarding the jury's consideration of whether certain witnesses were accomplices. These instructions include the direction that "[t]he defendant has the burden of proving by a preponderance of the evidence that each of the following witnesses was an accomplice in the crimes charged against the defendants: [¶] Victor Cervantes [¶] Oscar Menendez [¶] Luis Ruelas [¶] Larry Valencia." The court also instructed the jury pursuant to CALJIC No. 3.14 that "[m]erely assenting to or aiding or assisting in the commission of a crime without knowledge of the unlawful purpose of the perpetrator and without the intent or purpose of committing, encouraging or facilitating the commission of the crime is not criminal. Thus a person who assents to, or aids, or assists in, the commission of a crime without that knowledge and without that intent or purpose is not an accomplice in the commission of the crime."

Generally, the issue of whether a witness is an accomplice is a factual question. Only when there is no dispute as to either the facts or the inferences reasonably to be drawn from the facts would the court find a witness an accomplice as a matter of law. (*People v. Fauber* (1992) 2 Cal.4th 792, 834; *People v. Rodriguez* (1986) 42 Cal.3d 730, 759 (*Rodriguez*.)

Section 1111 defines an accomplice as a person who is liable to prosecution for the identical offense for which the defendant is being tried. In Menendez's case, his responsibility for McIntosh's death would have been as an aider and abettor since Gomez rather than Menendez was the shooter. (*People v. McLain* (1988) 46 Cal.3d 97, 106 [§ 1111 covers all principals to a crime, including aiders and abettors].) Menendez's presence at the scene, his failure to prevent McIntosh's murder and even his assistance to Gomez and Mota with knowledge of their criminal purpose (of which there was no evidence) would not be enough to support a finding that Menendez was an accomplice as a matter of law. (*Rodriguez, supra,* 42 Cal.3d at p. 760.) Menendez would only be an

---

matter of law. Elizalde told the court that he would "rather leave it [the determination of whether these witnesses were accomplices] up to the jury . . . ." Nevertheless, we consider this issue because it has also been raised by Mota.

26

accomplice as a matter of law if the evidence was undisputed that Menendez shared Gomez and Mota's criminal purpose. (*People v. Sully* (1991) 53 Cal.3d 1195, 1227.)

In fact, there was considerable evidence in the record that Menendez did not even realize that Gomez and Mota intended to look for and kill Norteños, much less share their criminal purpose.[16] Menendez testified that at the time McIntosh was murdered he had not committed to being a Varrio Frontero Loco, not wanting that "for my future." He wanted only to be with girls and go to parties with the gang members, "but . . . didn't like the rest that they used to do." Although he knew that gang members attacked Norteños, he himself was never asked to join in. Menendez knew that the Norteños were the Varrio Frontero Loco's rivals. Menendez knew what areas were Norteño territory. He also knew that if a Varrio Frontero Loco found a Norteño or saw one he was to "[b]eat him up and if you have a gun you have to use it." He did not, however, think that he was expected to hunt Norteños. When he went with Mota and Gomez on April 13, 2008, which was the day he shot himself by accident, he did not know that they were looking for Norteños to kill. Nor did he think that was the case on April 26, 2008. He did not realize that they were looking for Norteños to kill until the car did not turn toward the McDonald's on Broadway as he had expected.

Menendez's testimony that he neither wished nor was expected to join in the violence against Norteños, along with his testimony that he was unaware that Gomez and Mota intended to shoot anyone the night McIntosh was murdered or on the earlier occasion when he (Menendez) was accidentally shot, created a factual dispute as to

---

[16] The trial court specifically found that Menendez's "version of events that when he first shot himself that is because he was grabbing the gun out of the hands of whoever was holding it to prevent him from shooting someone. On the second occasion he didn't know that anyone had the gun until Mr. Gomez pulled it out and started shooting. [¶] So my view is if the jury accepts Mr. Menendez's version of events, it is not as a matter of law that he is an accomplice. That is a factual dispute the jury must decide. [¶] And I am essentially finding the same thing as to all of the ones I listed in the instruction saying that the defense has the burden of proving it by a preponderance."

27

whether he was an accomplice. The court, therefore, properly put this matter before the jury.

Gomez argues for the first time on appeal that the People were judicially estopped from opposing his argument that the court should instruct the jury that Menendez was an accomplice as a matter of law because they had earlier obtained an indictment that stated that Menendez "went hunting for Norteños with [Gomez] and Mr. Mota and that Mr. McIntosh was killed with Mr. Menendez's gun . . . ."

The application of judicial estoppel is discretionary. (*Levin v. Ligon* (2006) 140 Cal.App.4th 1456, 1468). Because Gomez did not request at trial that the court exercise its discretion in this regard, he has forfeited this argument on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 353; *People v. Williams* (1998) 61 Cal.App.4th 649, 655.)

In any event, the trial court would surely not have granted such a request. The court has the discretion to impose this remedy " ' "when a party's inconsistent behavior will otherwise result in a miscarriage of justice." ' " (*Levin v. Ligon, supra,* 140 Cal.App.4th at p. 1468.) The People did not engage in inconsistent behavior. The indictment did not allege that Menendez was an accomplice as a matter of law. At best, it contains language that could support such an argument. The record contained ample evidence to the contrary and the trial court properly made its decision based on this evidence.

### 2. *Cervantes*

There was little evidence that Cervantes conspired with Varrio Frontero Loco to kill Norteños or that he was otherwise involved in any of the crimes committed by defendants. Cervantes testified that he gave Molina a ride home after he got out of jail and spoke to him about the killing of an unnamed Norteño. Although there was evidence that Cervantes was a member of Mexican Locos, there was no evidence that he shared Mota or Elizalde's intention to kill Norteños in order to increase the stature of Varrio Frontero Loco in the community. Therefore, the trial court properly left to the jury the question of whether Cervantes was an accomplice.

28

### 3. *Valencia*

There was also a factual dispute about whether Valencia was an accomplice to the Perez murder. Menendez testified that he did not think Valencia was even a gang member. Valencia testified that he was not a gang member and only went in the car with Azamar after they encouraged him to do so. Valencia was aware that they had driven into Norteño territory, but he had never seen anyone killed before. In fact, he asked to be driven home after the murder rather than join in the bragging and celebration that followed.

The fact that Valencia was present at the scene and did not prevent the Perez murder is insufficient to make him an accomplice. Moreover, even if there was evidence (and there was not) that he assisted Mota and Molina in the murder, this would not be sufficient for a finding that he was an accomplice. (*Rodriguez, supra,* 42 Cal.3d at p. 760.) Our review of the record reveals that the trial court did not have before it undisputed evidence that Valencia shared Gomez and Mota's criminal purpose. (*People v. Sully, supra,* 53 Cal.3d at p. 1227.) Therefore, it was not required to instruct the jury that Valencia was an accomplice as a matter of law.

### 4. *Ruelas*

Ruelas, like Elizalde, was not present at any of the murders. In addition, there is no evidence in the record directly linking him to any of the crimes committed by defendants. His complicity in these crimes would, therefore, be as a co-conspirator.

There was conflicting evidence about whether Ruelas had assumed a co-conspirator role in "bringing the hood back." Ruelas appeared to be an important member of Varrio Frontero Loco. Sanchez testified that, in terms of the hierarchy of Varrio Frontero Loco, Elizalde was the leader, and Sanchez was directly under him along with Mota, Ruelas, and several others. According to Sanchez, Ruelas was one of the Varrio Frontero Loco who were "going to bring them back . . . just the ones who got to take care of everything." Menendez also named a number of Varrio Frontero Loco as those with the most respect in the gang. Ruelas was among them. Elizalde also would

29

send Ruelas out to collect debts using violence. Ruelas testified that violence was "an important part of bringing the hood back."

Ruelas himself testified that he was a member of Varrio Frontero Loco for six years until 2008. There was evidence, however, that Ruelas's involvement in Varrio Frontero Loco was most significant and committed before Elizalde assumed control. Ruelas did not like Elizalde. Although Elizalde had given him an order to kill someone, Ruelas did not do so because he was working as an informant and had agreed not to participate in the commission of any crimes.

Given the factual dispute about Ruelas's accomplice status, the trial court did not err in putting the question to the jury.

### 5.    *Prejudice*

Even if the trial court did err in putting the accomplice question to the jury, "[a] trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record. [Citation.] 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]' [Citation.] The evidence is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth. [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 370.)

We reject defendants' argument that the witnesses' testimony was insufficiently corroborated. First, with regard to Oscar Menendez, Menendez testified that after he witnessed the McIntosh shooting, he did not want to join in Mota and Gomez's celebration of the murder and asked them to take him home. He testified that when they arrived at his house, Mota told Menendez that he was on parole and couldn't have the gun. Mota told Menendez to take the gun. This testimony was corroborated by San Pablo Police Detective David Hoff, who testified that he did in fact find the gun used in the McIntosh shooting in Menendez's bedroom. Menendez's description of the way in which McIntosh was approached was also corroborated. Menendez testified that when Mota spotted Rico McIntosh, Gomez asked him "if he is a buster." McIntosh's friend

30

Lorry Scherrer testified that McIntosh told her after the shooting that he had been approached by three people who asked him if he was a "buster" before they shot him. San Pablo Police Officer Matthew Spanner also testified that McIntosh told him that he was asked if he was a "buster" before he was shot. The testimony of Hoff, Scherrer and Spanner provide sufficient corroboration of Menendez's testimony.

Second, Victor Cervantes testified that when he picked Molina up from jail, Molina told him that he had been released because he had been caught with a gun that was not the murder weapon. Molina also told him, in effect, that he and Romero had murdered Centron. Molina's telephone calls to his mother in which he made the same admission adequately corroborate Cervantes's testimony.

Third, Luis Ruelas's testimony that Molina told him that he had killed Centron was corroborated by the same telephone calls to his mother that corroborated Cervantes's testimony.

Finally, Valencia testified that when Camacho got out of the car he said to Luis Perez "Show me your hands, show me your hands." When Perez yelled "[w]hat the fuck is going on?" Camacho immediately shot him. This was corroborated by a neighbor who heard the confrontation, Ganehin Saele. Saele testified that she heard someone say "what the fuck?" and then heard gunshots.

## E.     *Batson-Wheeler*

Mota contends that, in exercising a peremptory challenge against Juror Number 5, the only African-American juror on the panel, the prosecutor violated his right to a trial by a jury drawn from a representative cross-section of the community, a right guaranteed under both the California Constitution (article I, section 16) and the Fourteenth Amendment of the United States Constitution. He is incorrect.

### 1.     *Factual Background*

After the prosecutor exercised a peremptory challenge to Juror No. 5, defense counsel moved for a mistrial under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), overruled in part by *Johnson v. California* (2005) 545 U.S. 162 (*Johnson*).

31

Defense counsel told the court that Juror No. 5 would be the only African-American seated on the jury. According to counsel, this juror had "27 years of military experience. He did not indicate any biases, and I believe that he is being relieved because of his race." The court asked the prosecutor to respond "to the issue of a prima facie showing."

The prosecutor offered the following response: "I do not believe there is any prima facie showing, and this is why: I worked extremely hard to rehabilitate a juror named [Mr. P.]. [¶] Mr. [P.] was actually seated next to [Juror No. 5] last week when he came into the box immediately in front of [Juror No. 5]. [¶] Mr. [P.] was an African-American male about the same age as [Juror No. 5], and I liked a lot of things about Mr. [P.], including his job along with his wife's experience as an emergency room nurse. [¶] Unfortunately, as you may recall, I worked hard to rehabilitate him, and he said that I had gotten him from the defense starting on the 30 yard line up to the 45. [¶] He was close to not being for cause, but I didn't do my job well enough, I suppose, and he ended up being a for cause challenge made by Mr. Morton and Ms. Bethards. [¶] That was an African-American juror that we lost, who[m] I was perfectly satisfied with. [¶] On the other hand, I don't believe I need to give my reasons at this point, because you haven't made a prima facie case, but I do think the fact that I worked hard to rehabilitate one African-American juror, was not able to do so, cuts directly against any argument that there is a prima facie case of discrimination based on race in the People's peremptory challenge, or voir dire strategy."

Defendants argued that the People's effort to rehabilitate an African-American juror was insignificant in light of the fact that Juror No. 5 was a candidate who was "completely neutral."

The court ruled that defendants had failed to make a prima facie case. The court explained that, under the standard articulated in *Johnson, supra,* 545 U.S. 162,[17] "I do

---

[17] The court correctly summarized that standard as requiring an inquiry into "whether the defendant has shown based on the totality of the relevant facts that those

32

not believe the facts as [a] totality before me would suggest that inference is appropriate. [¶] I do understand . . . that a person of the African-American race is within a cognizable group, and I do know that the law . . . permits a finding of . . . a prima facie case on the basis of a single strike of that group. So it's not a numerical issue, it's the conduct of the voir dire as a whole." The court also noted that "I do think that [Juror No. 5] is the first African-American who has been in the box for purposes of peremptories. [¶] We have had other African-American potential jurors, but they have been excused for cause or hardships. [¶] The record would reflect that so far [Juror No. 5] is the only African-American in the box as I have indicated; that the defendants are of Hispanic descent, to the extent that may or may not be relevant, but, in any event, I don't find a prima facie case, but you may state your reasons for the record."[18]

The prosecutor stated "for the record" that "there are a lot of good things about [Juror No. 5], including his military service. Unfortunately, the main part of his military service was serving as a substance abuse counselor. . . . [A]lmost as a general rule, I am not going to leave counselors or psychiatrists on a criminal jury. [¶] On top of that, I specifically questioned [Juror No. 5] about this, a substance abuse counselor in his position worked with almost, I think he said, almost 90 percent of his work had been involved in criminal activity and had been accused or convicted for drug activity. Somebody that works with felons or convicted misdemeanants or convicted felons on a daily basis is not someone I want on a criminal jury of any sort, no matter what color, what creed, what race they are."

The court then excused Juror No. 5. Defendants now argue that it erred in so doing. We disagree.

---

facts give rise to an inference of discriminatory purpose or whether the evidence is sufficient to permit the trial judge to draw an inference that discrimination has occurred."

[18] Although we conclude that, because the trial court correctly found that no prima facie case had been shown, the prosecutor's explanation of his rationale for excluding Juror No. 5 is not relevant to the question of whether there a prima facie case has been made, we nevertheless include this information in order to discuss that issue.

## 2.    *Discussion*

We apply certain well-established principles in deciding this issue.  "[T]he use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article 1, section 16 of the California Constitution."  (*People v. Alvarez* (1996) 14 Cal.4th 155, 192; see also *Wheeler, supra,* 22 Cal.3d at p. 272.)  This discriminatory use of peremptory challenges similarly violates the defendant's federal constitutional right to equal protection.  (*Batson, supra,* 476 U.S. at pp. 84-89.) [¶]  We presume the People use their preemptory challenges in a constitutional manner.  (*Wheeler, supra*, 22 Cal.3d at p. 278; *People v. Alvarez, supra,* 14 Cal.4th at p. 193.)  For this reason, the defendant bears the burden of establishing a prima facie case of purposeful discrimination.  (*People v. Arias* (1996) 13 Cal.4th 92, 134-135; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1122; *People v. Alvarez, supra,* 14 Cal.4th at p. 193.)  To do so, the defendant must raise this issue " ' "in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, . . . he should make as complete a record of the circumstances as is feasible.  Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule.  Third, from all the circumstances of the case he must show a strong likelihood [or reasonable inference] that such persons are being challenged because of their group association . . . ." ' [Citations.]"  (*People v. Box* (2000) 23 Cal.4th 1153, 1187-1188, disapproved on another ground in *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10.)

When we conclude that the trial court correctly ruled that a defendant failed to show a prima facie case of purposeful discrimination, we do not "review the adequacy of counsel's justifications for the peremptory challenges.' " (*People v. Box, supra*, 23 Cal.4th at p. 1188.)  The fact that a prosecutor is permitted to make a record of his justifications for exercising a peremptory challenge does not change this basic rule. (*Ibid.*)

On appeal, we must determine whether substantial evidence supports the trial court's conclusion. (*People v. McDermott* (2002) 28 Cal.4th 946, 970.) Because it does, we reject defendant's argument.

Here, the trial court found that defendant failed to make out a prima facie case of discriminatory intent. Substantial evidence supports the court's conclusion that the totality of the relevant facts did not "give rise to an inference of discriminatory purpose." First, the fact that the People made an effort—and a vigorous one at that—to rehabilitate another African-American juror points to the People's lack of a "discriminatory purpose" in its exercise of a peremptory challenge to Juror No. 5. Simply put, if the prosecutor had such a purpose, we would not expect the prosecutor to make a case *against* excusing a different African-American juror.

The People also point out that the prosecutor earlier passed on a jury that actually contained Juror No. 5. The prosecutor did not actually exercise a peremptory challenge against Juror No. 5 until a juror on the original panel had to be excused and jury selection resumed. Although more than one inference can be drawn from the fact that the prosecutor had earlier passed on Juror No. 5 and did not excuse him until jury selection was reopened, one reasonable inference—and the inference the trial court made—is that the prosecutor was not concerned with the race of jurors in his selection decisions. Substantial evidence, therefore, supports the trial court's finding that defense failed to make out a prima facie case of discriminatory jury selection.[19]

Defendants, however, argue that, when we take into account the prosecutor's "for the record" explanation for his prima facie challenge, an explanation the trial court

---

[19] Defendants correctly argue that their burden of making out a prima facie case can be met even as to a single peremptory challenge to an African-American juror. (*People v. Thomas* (2011) 51 Cal.4th 449, 474.) However, although the People argue to the contrary, the trial court did not base its conclusion that no prima facie case was shown on the fact that the prosecutor only excused one African-American juror. In any event, our review of the record indicates that substantial evidence supports the trial court's conclusion.

correctly observed was irrelevant to its determination of whether defendant had made out a prima facie, we must find that the trial court erred. We disagree.

A trial court does not scrutinize a prosecutor's explanation for his exercise of a peremptory challenge until *after* it concludes that the defendant has made out a prima facie case of discrimination. The trial court's prima facie ruling here was explicitly—and correctly—not based on the prosecutor's stated rationale, which came after the court made its ruling. We do not consider such a statement when we ask whether substantial evidence supports the court's ruling on the question of whether defendants had met their prima facie burden. (*People v. Box, supra,* 23 Cal.4th at p. 1188, disapproved on another ground in *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10; *People v. Davenport* (1995) 11 Cal.4th 1171, 1200, abrogated on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.) Thus, while we consider the "entire record of voir dire" in our review (*People v. Box, supra,* 23 Cal.4th at p. 1188), once we " 'conclude[] that the trial court properly determined that no prima facie case was made, [we] need not review the adequacy of counsel's justifications for the peremptory challenges.' [Citation.]" (*Ibid.*)

The cases on which defendants rely in making the contrary argument involve situations in which the trial court had either explicitly or implicitly found that the defendant had made a prima facie case. These inapposite cases, therefore, are not helpful to defendants.

In *Kesser v. Cambra* (9th Cir. 2006) 465 F.3d 351, 360, the court implicitly found that defense counsel had made out a prima facie case of discrimination and was, therefore, concerned with the ultimate question of whether the lower court erred in finding that the prosecutor had not exercised his peremptory challenges in a discriminatory way. Similarly, in *Crittenden v. Ayers* (2010) 624 F.3d 943, 950 (*Crittenden*), the court registered its agreement with the California Supreme Court's earlier decision in the matter that "Crittenden made a prima facie showing of discrimination and that the state carried its burden of articulating a race-neutral justification for the peremptory strike." *Crittenden*, therefore, does not support defendants' argument regarding the trial court's analysis of the record at the prima facie

36

stage. Finally, in *Johnson v. Vasquez* (9th Cir. 1993) 3 F.3d 1327, 1329, footnote 2 (*Vasquez*), the court announced that it "need not address the question whether Johnson offered prima facie evidence of intentional discrimination [citation], because the prosecutor offered an explanation for the challenge, and the trial court ruled on the ultimate question of discrimination. [Citation.]" The *Vasquez* court, therefore, did not analyze the issue of whether the defendant had made out a prima facie case because the trial court had impliedly ruled that a prima facie case had been shown. Given that the defendant had met his burden, the court of appeal looked only at the "ultimate question of discrimination," an inquiry that does involve scrutiny of the prosecutor's explanation for his challenge.

Here, in contrast to *Kesser, Crittenden,* and *Vasquez,* the trial court explicitly ruled that defendants had not met their burden of showing a prima facie case, and correctly did not consider the prosecutor's explanation for his peremptory challenge.[20] Therefore, when we consider this issue, we look only at the record before the trial court at the time it made its prima facie case ruling.

## F. *Corroboration of Sanchez Testimony*

Mota also argues that Sanchez—whom the trial court found was an accomplice as a matter of law—was not adequately corroborated as required by section 1111 and, therefore, the jury could not have relied on it to reach its verdicts. We disagree.

With regard to the Centron murder, Sanchez's testimony regarding Molina's role as the shooter was confirmed by Molina's admission to his mother that he had, in fact, shot Centron. Sanchez's testimony regarding the McIntosh murder to the effect that Mota told him he had shot someone that night, was corroborated by the testimony of Detective David Hoff that he had found the gun Gomez used in the shooting in Menendez's bedroom. In addition, Contra Costa County Deputy Sheriff Criminalist Terreance Wong's expert testimony that the gun recovered from Menendez's bedroom

---

[20] The prosecutor's decision to put these reasons "on the record," following the trial court's decision regarding the prima facie case issue does not alter this procedure.

was the weapon used to shoot McIntosh corroborated Sanchez's testimony regarding the shooting. Moreover, even if Sanchez's testimony was not admissible, our review of the record indicates that there was ample evidence, particularly from the testimony of Menendez, Ruelas, Cervantes and Valencia to support defendants' convictions.

**G.** ***Admissibility of Mota's Booking Statements Regarding Gang Membership***

**1.** ***Facts***

On May 3, 2008, after he was arrested, Mota was taken to the Contra Costa County's Martinez detention facility. When an arrestee such as Mota first arrives at the detention facility, an "escort deputy" meets him and asks three questions. "They will ask them if they have been here before. That will aid the booking officer in bringing up their information. [¶] They will ask them if they have any gang affiliations so that they know . . . where to put them once they come inside of intake. [¶] And then they will ask them if they have any fears for their safety." If a suspect reports any fear for his safety, requests protective custody or if they belong to a gang "they will go into one of the rooms to await . . . the processing . . . ."

Contra Costa County Sheriff's Deputy Michael Rector and Deputy Gonzalez,[21] were the "back door intake" deputies that evening and the first deputies Mota encountered when he arrived at the detention facility. Upon his arrival, Mota was put in a separate room. When Rector told Mota he was going to search him for contraband, Mota "began to laugh nervously." Mota then said, "man, I'm in here for some shit that I didn't do. They said that I killed someone, but it wasn't me. I was there, but I didn't kill anyone. The guy that did it is already in jail. He confessed already, but now he is trying to bring me down too . . . ." Mota became agitated and said, "I'm a gang banger, but I'm not a murderer." He then told Rector that "I told those other cops that I didn't know anything because I thought I would be in trouble, but now I don't care . . . ." Rector asked Mota if he wanted to talk to a San Pablo Police detective. Mota replied, "Yeah, I

---

[21] Deputy Gonzalez did not testify.

will, but first I should talk to my lawyer. After I talk to him I will tell you guys what really went down . . . ."

Rector did not ask Mota about his gang affiliation. He did, however, understand that Mota was involved in a gang, based on earlier statements Mota had made to Deputy Gonzalez, who was working alongside him that evening.

Mota's statements struck Rector as important to the San Pablo Police Department, so he wrote up a summary of the conversation in order to "assist them in their case."[22]

Following Rector and Gonzalez's interaction with Mota, Deputy Bryan Zaiser, who worked in the facility's classification unit, interviewed Mota. He did so because Mota appeared to be gang affiliated. Zaiser would typically tell the arrestee that the classification questions were for an "administrative purpose," and "for their housing." Prior to the interview, Zaiser did not read *Miranda* warnings to Mota, did not advise him that he had a right to decline to answer the questions nor did he tell him he was required to answer the questions. Mota did not express any fear for his safety before the interview.

Zaiser filled out a classification questionnaire when he spoke to Mota. Zaiser indicated on the questionnaire that Mota identified himself as "affiliated with the Sureño street gang," and said he was "part of VFL, which is Varrio Frontero Loco," and had been since he was 14 years old. According to Zaiser, Mota told him that he (Mota) was an active Sureño gang member.

At the time he interviewed him, Zaiser was aware that Mota had been charged with murder.[23] He did not know that Mota had been accused of killing a "suspected Norteño."

_____

[22] Generally, when an arrestee identified himself as a gang member, the deputy would write a "classification incident detail report," which would then be forwarded to a supervisor, who would forward the report to "the appropriate people."

[23] It was common for the arresting agency (in this case, the San Pablo Police to bring with them "booking paperwork with the charges they are booking the inmate for."

Zaiser testified that, because of the risk of harm to an inmate suspected of killing a Norteño, he would not house that inmate in the general population, where Norteños were housed. There was separate housing for Sureños.

Each of the murder charges against Mota alleged an enhancement for participating in a criminal street gang pursuant to section 186.22, subdivision (b)(1). He was also charged under section 182.5 with participating in a criminal street gang.

Before trial, Mota moved to suppress his admission of gang membership. He argued that because the sheriff's deputies to whom he disclosed his gang affiliation knew or should reasonably have known that the questions about his gang affiliation were likely to elicit an incriminating response, they were required to give *Miranda* warnings before questioning him.

The People contended that because none of the sheriff's deputies who discussed with Mota his gang status were actually aware that he had been charged with gang-related crimes, the questions he was asked were part of a custodial interrogation for which no *Miranda* warnings were required.

In admitting this evidence, the court made a number of factual findings. First, it found that "the sole purpose of this interview and the form is to ensure the safety of inmates and staff at the county jail. The information gathered is essential to maintain security at the jail. . . . [¶] . . . [I]f the jail were to house rival gang members together at random it would pose a grave security risk to both the inmates and the staff. [¶] So I find that it is a fundamental and essential obligation of the sheriff's department to determine whether it is dangerous to house any inmate with any other inmate or any gang member with any rival gang member."

The trial court stressed that although Zaiser knew that Mota had been charged with murder, Zaiser was not aware of the gang enhancement and gang charges alleged against Mota. The court found, therefore, that Zaiser "had no actual subjective intent to gather incriminating information." The court also noted that Zaiser's subjective intent was "not the standard but it is a relevant factor."

Zaiser did not, in the court's opinion, "use any coercive tactics, that is, no threats, no promises. There was no threat that if . . . Mr. Mota didn't answer the questions, that he would be housed with Norteños." With regard to Mota's understanding of the purpose of these questions, the court found "that Mr. Mota would have every reason to make sure that the deputies knew to house him with Sureños. It would be in Mr. Mota's wholly personal interest in self-preservation that he be classified correctly. And it would be extreme danger to his life if he were not classified correctly and housed with other Sureños. [¶] So my view is that Mr. Mota would have wanted the deputies to know that he was a Sureño so his life would not be imperiled. And I believe he willingly and voluntarily answered the questions for that reason."

The court denied the motion to dismiss and Mota's admission of gang membership was admitted at trial. The jury ultimately found Mota guilty of the street gang conspiracy charge and also found the street gang enhancements true as to the three charged homicides of which he was found guilty.

### 2. *Discussion*

Mota contends that the trial court erred in denying his motion to suppress the statements he made during his classification interview. He argues that this interview constituted a custodial interrogation and, therefore, the law enforcement personnel he spoke with were required to read him his *Miranda* rights. We agree.

In *Rhode Island v. Innis* (1980) 446 U.S. 291 (*Innis*), the United States Supreme Court clarified what sort of police action constitutes a "custodial interrogation" that must be preceded by a *Miranda* warning. The *Innis* court held that " 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."[24] (*Innis, supra,* 446 U.S. at p. 301.) Accordingly, "[a] practice that the police

---

[24] The court also noted that "[t]he latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody

41

should know is reasonably likely to evoke an incriminating response from a suspect . . . amounts to interrogation.  But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response."  (*Innis*, *supra,* 446 U.S. at pp. 301-302.)

Ten years later, in *Pennsylvania v. Muniz* (1990) 496 U.S. 582, 600-602 (*Muniz*), the court considered whether the *Miranda* safeguards came into play when a police officer asked a suspect in custody for—among other things—his "name, address, height, weight, eye color, date of birth, and current age . . . ."[25]

In considering this question, the court began with the general rule set out in *Innis,* that "[c]ustodial interrogation for purposes of *Miranda* includes both express questioning and words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to 'have . . . the force of a question on the accused,' [citation] and therefore be reasonably likely to elicit an incriminating response."  The court then concluded that questioning a suspect about his name, address, height weight, eye color date of birth and current age fell "within a 'routine booking question' exception" to *Miranda,* an exception that applies to questions asked in order to secure the " ' "biographical data necessary to complete booking or pretrial services." ' "  In reaching this conclusion, the court relied on the lower court's

with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police."  (*Innis, supra,* 446 U.S. at p. 301.)

[25] Although the United States Supreme Court considered this issue for the first time in *Muniz*, it noted that a number of federal courts had previously found that "routine biographical questions" fell outside the scope of *Miranda*.  These cases were *United States v. Glen-Archila* (11th Cir. 1982) 677 F.2d 809, 815-816 (home address); *United States v. Avery* (6th Cir. 1983) 717 F.2d 1020, 1024-1025 ("subjects such as defendant's date of birth and address" in order to complete an identification form which "did not relate, even tangentially, to criminal activity") and *United States v. Mata-Abundiz* (9th Cir. 1983) 717 F.2d 1277 (background questions  not asked during routine booking procedure and directly related to an element of crime the interrogating officer suspected of defendant did not fall within routine booking exception).

factual finding that these questions "were 'requested for record-keeping purposes only,' [citation] and therefore the questions appear reasonably related to the police's administrative concerns." (*Muniz, supra,* 496 U.S. at pp. 601-602.)

Even before the United States Supreme Court decided *Muniz*, our Supreme Court, in *People v. Rucker* (1980) 26 Cal.3d 368, 387 (*Rucker*), held that "[t]he *Miranda* safeguards are not necessary at a proper booking interview at which certain basic information is elicited having nothing to do with the circumstances surrounding any offense with which the defendant has been charged. [Citations.] The booking procedure, as defined by statute (Pen. Code, § 7, subd. 21), has been described as 'essentially a clerical process.' [Citation.] The limited information needed at a booking procedure is required solely for the purposes of internal jail administration, not for use in connection with any criminal proceeding against the arrestee. When use of this information is confined to those proper purposes, its elicitation cannot be considered incriminatory."

The *Rucker* court went on to hold, however, that although *Miranda* warnings "need not be given at a booking interrogation" intended to elicit "from an arrestee the basic, neutral information that is necessary for proper jail administration, [the state is forbidden to use] the arrestee's responses in any manner in a subsequent criminal proceeding."[26] The court explained that "[i]t is not just the nature of the information revealed but the potential for incrimination under all the circumstances that is important. In the present case, appellant had been arrested for a homicide. Homicide is ' "an area permeated with criminal statutes," ' and those arrested for murder are, for purposes of the privilege, 'a group "inherently suspect of criminal activities." ' [Citation.] . . . Evidence of an arrestee's responses to booking questions can constitute 'evidence which will facilitate [his] conviction[ ]' unless its use is limited to the purposes for which it was

---

[26] Similarly, the court in *United States v. Willock* (D.Md.2010) 682 F.Supp.2d 512, 528-529, observed that "[e]liciting information from an inmate about his gang affiliation solely for prison administrative purposes does not implicate *Miranda*. It is only when such information is used against the inmate in a prosecution that *Miranda* warnings are required." (*Id.* at p. 533, fn. 26.)

43

elicited. [Citation.]" (*Rucker, supra*, 26 Cal.3d at p. 389.) Although *Rucker* appears to have been superseded by Proposition 8 (*People v. Herbst* (1986) 186 Cal.App.3d 793, 799-800), the *Rucker* court's definition of a routine "booking procedure" is consistent with that articulated in *Muniz*—a procedure designed to elicit "basic, neutral information." (*Rucker, supra,* 26 Cal.3d at pp. 388-389.)

Our Supreme Court very recently considered the booking exception in *People v. Williams* (2013) 56 Cal.4th 165 (*Williams*). In that case, a suspect in custody told a police officer during his intake interview that he needed protection because an unidentified inmate had threatened to stab him. (*Id.* at p. 183.) When one of the officers asked why he had been threatened, defendant responded " '[b]ecause I killed two Hispanics.' " (*Id.* at p. 184.) Another officer recalled asking defendant what his crime was. The officer noted defendant's statement that he had killed two Hispanics in an interview intake report that he did not provide to any investigating agency. (*Id.* at p. 184.) The statement was ultimately used at trial against the defendant.

The *Williams* court held that defendant's un-*Mirandized* admission that he had "killed two Hispanics" fell under the booking exception to *Miranda*. In so doing, the court cited the *Innis* court's definition of interrogation: " '[T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . [T]he Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. . . . [S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.' " (*Innis, supra*, 446 U.S. at pp. 301-302, fns. omitted.).") (*Williams, supra,* 56 Cal.4th at pp. 186-187.)

44

The court, citing *People v. Gomez* (2011) 192 Cal.App.4th 609, 630, then noted that the "governing considerations" in determining whether questions fall within the booking exception are as follows: "' In determining whether a question is within the booking question exception, courts should carefully scrutinize the facts surrounding the encounter to determine whether the questions are legitimate booking questions or a pretext for eliciting incriminating information. [Citation.] Courts have considered several factors, including the nature of the questions, such as whether they seek merely identifying data necessary for booking [citations]; the context of the interrogation, such as whether the questions were asked during a noninvestigative clerical booking process and pursuant to a standard booking form or questionnaire [citations]; the knowledge and intent of the government agent asking the questions [citations]; the relationship between the question asked and the crime the defendant was suspected of committing [citations]; the administrative need for the information sought [citations]; and any other indications that the questions were designed, at least in part, to elicit incriminating evidence and merely asked under the guise or pretext of seeking routine biographical information [citations].' [Citation.]" (*Williams, supra,* 56 Cal.4th at p. 187.)

The *Williams* court concluded that Williams' "intake interview at Folsom Prison was closely analogous to the process of being booked into jail." The court pointed out that not only did the officers have no intention of eliciting an incriminating response, but the follow up questions they asked were not ones they should reasonably have expected to elicit an incriminating response. The court explained: "Whether it was White or Reed who asked defendant either 'why are they going to stab you?' (as White remembered), or 'what his crime was' (as Reed recalled), neither question was designed to elicit an incriminating response." The officers were appropriately responding to defendant's own security concern, and would not reasonably have expected him to produce a confession. (*Williams, supra,* 56 Cal.4th at p. 188.)

Turning now to this case, we begin by noting that the trial court found that although the deputies were aware that Mota had been charged with murder, they were not specifically aware that, in addition to murder, Mota had been charged with an

45

enhancement and an additional crime based on his gang membership. Therefore, they did not ask Mota this question in order to elicit an incriminating response. However, as the trial court recognized, whether a particular question was intentionally designed by the police to evoke an incriminating response is only one fact the court looks at in determining whether words or actions on the part of a police officer constitute an interrogation. *Innis, Muniz* and *Williams* all make clear that an officer's subjective intent in asking a question is neither the only fact nor the determinative fact the court should consider in determining whether a question falls within the booking exception. Therefore, even if a question was not intended to evoke an incriminating response, if it was a question the officer should have reasonably expected to evoke such a response it would fall outside the booking exception.

Here, the deputy who asked Mota whether he belonged to a gang "should [have] know[n]" that question was "reasonably likely to elicit an incriminating response . . . ." (*Muniz*, *supra*, 496 U.S. at p. 601.) Section 186.22, which imposes criminal penalties for participation in a criminal street gang, is part of the California Street Terrorism Enforcement and Prevention Act enacted in 1988. This enhancement had been in existence for more than 20 years before Mota was questioned, and it is unlikely that the deputy was unaware that participation in a criminal street gang is a felony or that an affirmative answer to the question would be incriminating. Similarly, section 182.5, which imposes an additional penalty for conspiracy to commit a felony by active participants in a criminal street gang, was added by section 3 of Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998, which was effective on March 8, 2000. In light of the length of time these laws had been on the books, a law enforcement professional should have known that an incoming inmate's admission of gang membership could well be incriminating.

It was also unlikely that the deputy would be unaware of the possibility that Mota might be a gang member and thus particularly likely to give an incriminating response to this question. The trial court found that this facility housed a large population of gang members, so many that they created a serious and real risk to the safety of inmates in

46

rival gangs as well as to the deputies themselves. A law enforcement official working in this milieu would not only be particularly likely to be aware of laws designed to deter such violence, he would also be aware that many inmates coming into the facility might belong to gangs. In such a setting, the possibility that an inmate's gang affiliation might be incriminating was neither abstract nor remote. Therefore, the deputies should have known that asking for this information was reasonably likely to elicit an incriminating response from Mota. And, of course, it did.[27]

Nor did this question seek "routine biographical information" that would fall within the booking exception to *Miranda*. The nature of the information for which this exception is intended to apply is aptly demonstrated by the cases the *Muniz* plurality recognized as establishing this exception and by *Muniz* itself. The pre-*Muniz* cases cited by that court involve questions designed to gather "mere pedigree information" or "routine background information." (*United States v. Avery, supra,* 717 F.2d at pp. 1024-1025 ["subjects such as defendant's date of birth and address" in order to complete the identification form which "did not relate, even tangentially, to criminal activity"]; *United States v. Mata-Abundiz, supra,* 717 F.2d 1277 [background questions, which were not asked during routine booking procedure, were directly related to an element of crime the interrogating officer suspected of defendant did not fall within routine booking exception]; *United States v. Glen-Archila, supra,* 677 F.2d at pp. 815-816 (11th Cir. 1982) [home address]; see also *United States ex rel. Hines v. LaVallee* (2nd Cir. 1975) 521 F.2d 1109, 1112-1113 [length of marriage and number of children disclosed to officer in casual conversation was "merely basic identification"]; *United States v. Burns* (2nd Cir. 1982) 684 F.2d 1066, 1075 -1076 (*Burns*).) ["appellant's history of drug use,

---

[27] In a similar case, *United States v. Williams* (D.D.C. 2012) 878 F.Supp.2d 190, 210, the court found that a question that related "directly to [the defendant's] connection with evidence of criminal activity" did not fall within the booking exception, even if "the police may not have been fully aware" of the criminal activity of which the defendant was suspected.

47

past record, and personal finances, cannot be characterized as mere pedigree" where they "could be incriminating at trial"].)

*Muniz,* like the federal cases that preceded it, recognized a booking exception for the sort of information that is, except in unusual circumstances, not reasonably likely to elicit an incriminating response. One's name, address, date of birth, length of marriage, number of children seldom relate "even tangentially to a crime." Nor would they generally be expected to incriminate a defendant.

Here, in contrast, the fact that a suspect in custody is a member of a gang often carries with it penal consequences. This information cannot be characterized as "mere pedigree" such as a name, address, or birthdate. (*Burns, supra,* 684 F.2d at p. 1076.) It "could be [and was] incriminating at trial" (*ibid.*) and, as such, is not routine background information of the sort that has been considered outside the *Miranda* safeguards. Nor is it the case that a question falls within the booking exception simply because it is routinely asked during the booking process. As the court noted in *United States v. Williams, supra,* 878 F.Supp.2d at page 210, "the mere timing of the question is insufficient to make it a legitimate booking question." Nor is it the case that the characterization of this question as "administrative" makes it a routine booking question. As the court in *Williams* observed, "asking Maurice Williams how he had arrived at the police station falls outside the routine identifying questions contemplated by the booking question exception. His mode of transportation on that particular day is not a personal identifying characteristic, nor was his answer necessary to serve a required property seizure receipt."

*United States v. Washington* (9th Cir. 2006) 462 F.3d 1124 (*Washington*) does not hold, as the People suggest, that the gathering of gang identification information falls outside the scope of *Miranda* under the routine booking exception. Although *Washington* involved a booking procedure in which that information was requested, the challenged evidence was not a defendant's self-identification as a gang-member. Rather, the court considered a question that asked defendant for his "gang moniker," or nickname. The court ruled that this question fell within the routine booking exception because "[q]uestions about a person's identity are not unconstitutional even if

48

identification of the person may help lead to the prosecution of that person for a crime." (*Id.* at p. 1133.) Therefore, the court rejected defendant's contention that his nickname should be suppressed, ruling that such a request "is no different from simply asking for a suspect's name." (*Ibid.*) The question asked Mota was not comparable to the identifying questions the *Washington* court ruled did not constitute interrogation. Mota was not being asked to reveal his name when he was asked whether he belonged to a gang. And certainly the fact of gang membership is not "routine" identifying information. Therefore, *Washington* is of no assistance to the People.

The People also point out that in *People v. Gomez, supra,* 192 Cal.App.4th 609, the Fourth District ruled that questions regarding gang affiliation during a booking interview fell within the routine booking exception to *Miranda* because they were not designed to elicit an incriminating response. The *Gomez* court appears to have based its conclusion on a footnote in *Muniz,* in which the court agreed with amicus United States that " '[r]ecognizing a "booking exception" to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.' " (*Muniz, supra,*496 U.S. at p. 602, fn. 14.)

*Muniz*, however, does not hold that the only type of question asked during booking that falls outside the routine booking exception is one which is " 'designed to elicit incriminatory admissions.' " (*Muniz, supra,* 496 U.S. at p. 602, fn. 14.) Were this the case, the court's language regarding questions the police "should know" might elicit an incriminating response would be meaningless, given that something an officer "should know" is something he did not, in fact, subjectively know. (*Id.* at p. 601.) The *Gomez* court recognizes that often an officer's subjective intent is quite relevant to this issue. Indeed, it is determinative in those situations in which the officer clearly designed the question with an interrogative intent. But even if an officer does not intend to elicit an incriminating response, and has not designed the question to do so, a question can still

49

constitute interrogation subject to the *Miranda* protections if the officer should have known this question was reasonably likely to elicit an incriminating response.

When answering this question, Mota had two choices. He could either admit to gang membership and incriminate himself or he could lie or refuse to answer the question and risk physical injury when he was housed with Norteño inmates.[28] We know of no other case involving the routine booking exception where the defendant was asked to choose between incriminating himself or risking serious physical injury. The price of protecting oneself from harm while in custody should not be incriminating oneself.

This is not to say the question cannot or should not be asked. We fully expect the police to continue to use it upon booking in order to protect jail personnel and inmates from harm. We hold only that the answer to this question may not be used against the defendant at trial, as it was here, in the absence of *Miranda* warnings.

### 3. *Prejudice*

The trial court's error in admitting this testimony was, however, harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, because Mota's gang membership was convincingly established by many other sources. Ruelas, Sanchez and Menendez all testified that, based on their familiarity with Mota as fellow gang members and/or friends, Mota was a member of Varrio Frontero Loco. In addition, San Pablo Police Officer Robert Brady, who testified as an expert oin Norteño and Sureño criminal street gangs, opined that Mota was a gang member. He did so based on information he had received from other gang members. He also based his opinion on a

---

[28] The trial court specifically found that "[t]here was no threat that if . . . Mr. Mota didn't answer the questions, that he would be housed with Norteños." But there was no need to make this threat. It was a fact that if Mota did not answer this question he would be housed with Norteños. As the court found, "Mr. Mota would have every reason to make sure that the deputies knew to house him with Sureños. It would be in Mr. Mota's wholly personal interest in self-preservation that he be classified correctly. And it would be extreme danger to his life if he were not classified correctly and housed with other Sureños. [¶] So my view is that Mr. Mota would have wanted the deputies to know that he was a Sureño so his life would not be imperiled. And I believe he willingly and voluntarily answered the questions for that reason."

50

2005 robbery Mota had committed in Willows in which Mota wore a blue bandana (the Sureño color). When he was committed to county jail following his arrest for this robbery, he was observed "throwing up" a hand sign that signified his Sureño status. Finally, in photographs taken of Mota at Victor Valencia's funeral, Mota made similar gang signs. Because Mota's gang affiliation was amply established by evidence other than the statements made by him during booking, any error is harmless beyond a reasonable doubt.

**H.** *Unjoined Perpetrators of Same Crime*

Defendants argue that the trial court erred in giving the jury CALJIC No. 2.11.5. The instruction is as follows: "There has been evidence in this case indicating that a person other than a defendant was or may have been involved in the crime for which that defendant is on trial. [¶] There may be many reasons why that person is not here on trial. Therefore, do not speculate or guess as to why the other person is not being prosecuted in this trial or whether [he] [she] has been or will be prosecuted. Your sole duty is to decide whether the People have proved the guilt of the defendant on trial." The use note to this instruction states: "Do not use this instruction if the other person is a witness for either the prosecution or the defense."

Defendants argue that this instruction permitted the jury, when evaluating the credibility of the five informant witnesses, to ignore the fact that they were all given deals of one kind or another. The issue of whether it was error to give this instruction in a trial in which unjoined coperpetrators testified was addressed most recently in *People v. Fonseca* (2003) 105 Cal.App.4th 543 (*Fonseca*). In that case, the trial court gave the 1996 version of CALJIC No. 2.11.5[29] The court held that this iteration of the instruction removed any

---

[29] The *Fonseca* court noted that the cases finding it was error to give this instruction in a trial in which an unjoined coperpetrator testified involved earlier versions of CALJIC No. 2.11.5. (*Fonseca, supra,* 105 Cal.App.4th at p. 548.) In addition, the *Fonseca* court noted that even when there was a finding of error as to the earlier version of CALJIC NO. 2.11.5, "in every case where the jury receives all otherwise appropriate general instructions regarding witness credibility, there can be no prejudice from jury

51

"lingering possibility that a reasonable juror would misunderstand his or her duty to consider all relevant factors bearing on witness credibility. Therefore, we hold that CALJIC No. 2.11.5, in its 1996 version, is not erroneous when given in a trial where an unjoined coperpetrator testifies." (*Fonseca, supra,* 105 Cal.App.4th at p. 550.)

The trial court in this case gave the 2004 version of CALJIC No. 2.11.5, which was revised to incorporate the *Fonseca* court's suggestion that the "the 1996 instruction would get closer to the heart of the matter if, instead of the italicized words[30] the phrases 'speculate upon' or 'guess at,' or words to that effect were substituted." The jury in this case, therefore, was instructed with a version of CALJIC No. 2.11.5 that would not suggest to a juror that he no longer had a "duty to consider all relevant factors bearing on witness credibility." (*Fonseca, supra,* 105 Cal.App.4th at p. 550.) We agree with the *Fonseca* court's reasoning regarding this instruction and, therefore, reject defendants' argument that the trial court erred in giving it.

## I. *Post-Crime Jail Incidents Used to Establish Gang Membership*

Several weeks after he was incarcerated, and about a month after the last charged homicide, Mota was involved in an incident in which he and Luii Hernandez attacked Jorge Sanchez, one of the informants in this case, shortly before the end of "free time" in the Q module, where Sureños are housed. After the fight, Sanchez was separated from

---

instruction pursuant to CALJIC No. 2.11.5. In other words, the potentially prejudicial effect of this instruction in the context of the testifying unjoined coperpetrator lies not in the instruction itself, but in the rather remote possibility that the trial court would fail to give otherwise pertinent and required instructions on the issue of witness credibility. (§ 1127; see also CJER Mandatory Criminal Jury Instructions Handbook (CJER, 11th ed. 2002) §§ 2.4, 2.96, pp. 13, 76.) There is no error in giving CALJIC No. 2.11.5 so long as a reasonable juror, considering the whole of his or her charge, would understand that evidence of criminal activity by a witness not being prosecuted in the current trial should be considered in assessing the witness's credibility. [Citation.]" (*Fonseca, supra,* 105 Cal.App.4th at pp. 549-550.) Defendant does not argue that the trial court failed to give these "otherwise pertinent and required instructions on the issue of witness credibility."

[30] The italicized words to which the court referred were that the jury not "discuss" or "give any consideration" as to why the unjoined coperpetrator was not being prosecuted in the trial. (*Fonseca, supra,* 105 Cal.App.4th at p. 548.)

52

Mota and Hernandez and not "let out" with the Sureños again. Eventually, Sanchez reached a deal with the prosecutor and entered a witness protection program.

Defense counsel sought to have evidence of this fight excluded. The prosecution argued that the evidence was admissible to show Mota acted "in concert with other gang members to accomplish certain goals." The trial court ultimately admitted evidence of the fight between Sanchez, Mota and Hernandez. It found that the May 24 incident was "relevant to Mr. Mota's gang membership, his conduct and participation in these crimes on behalf of the gang. So it's relevant to gang membership and motive and intent for the charged crimes." He explained that "[Evidence Code section] 1101(b) would permit admission of this . . . because it's proof of motive and intent." In addition, "the fact that it's one month later [than the last homicide committed before Mota's arrest] in my view was not so remote to make it irrelevant."[31]

Jorge Sanchez testified about the fight.[32] According to Sanchez, after he was arrested, he was placed in the Q module, where Sureños were housed. During free time, Mota and Hernandez approached him. Mota hit him in the head and Sanchez fought back. The deputy maced them and Sanchez got on the floor when the deputy told him to. Mota did not. Instead, he got on top of Sanchez, who fought back again. After this incident, Mota was "rolled up to B module." He explained that this occurred "just so you ain't no good no more."

Sheriff's Deputy Jesus Garcia testified that on May 24, 2008, he was assigned to the Q Module at the Martinez Detention facility. Mota, Hernandez and Sanchez were let out with the other Sureños on the Q Module. Although the Q Module housed "a variety

_____

[31] The court ruled that an admission Mota made after the attack to the effect that he had "done the beatings and that he was still down on Sureños in the sense that he could still be housed with Sureños " was not admissible because it was not preceded with *Miranda* warnings.

[32] Sanchez testified without objection before the court's ruling on this issue. Any claim of error with regard to the admission of his testimony has, therefore, been waived. In anticipation of an ineffective assistance of counsel argument, we nevertheless consider whether Sanchez's testimony, which was similar to that of Deputy Garcia, was admissible.

of administrative segregation inmates as well as protective custody inmates," Sureños were let out "alone by themselves."

Mota contends that evidence that he and another Sureño gang member attacked a Sureño informant while they were in jail was not relevant to the issue of whether he was an active participant in a criminal street gang at the time the crimes in this case were committed because Mota could have joined the Sureños gang after he arrived in prison and as a matter of self-preservation or camaraderie. He further argues that the admission of this evidence was not permitted under either section 186.22 or the street gang enhancement because evidence of post-crime activities cannot be used to show a violation of that statute. Finally, he argues that the admission of this evidence violated Evidence Code section 1101, subdivision (b), because it was used solely to show his bad character. We disagree.

"We apply the deferential abuse of discretion standard when reviewing a trial court's ruling on a relevance objection." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1123.) " 'Evidence is relevant if it has any tendency in reason to prove or disprove a disputed fact at issue.' [Citations.]" (*Id.* at p. 1123.) Evidence of Mota's participation with another Sureño in an attack on a "snitch" was relevant to the issue of whether he was a gang member at the time the murders were committed. The fact that he acted in concert with another gang member was also relevant to the issue of whether in committing the charged crimes he intended to "willfully promote[], further[], or assist[] in any felonious criminal conduct by members of that gang . . . ." (§ 186.22, subd. (a).) The jury could reasonably infer from his behavior that both were, in fact, the case.[33]

Mota cites *People v. Duran* (2002) 97 Cal.App.4th 1448 (*Duran*) and *People v. Godinez* (1993) 17 Cal.App.4th 1363, disappoved on other grounds in *People v. Russo*

---

[33] Although the fight occurred after the charged crimes, post-crime evidence may constitute circumstantial evidence of a defendant's intent at the time the charged crimes were committed. (*People v. Johnson* (1993) 6 Cal.4th 1, 36, overruled on another ground in *People v. Rogers* (2006) 39 Cal.4th 826, 879 [intent to steal can be proven circumstantially by post-crime actions]; *People v. Abilez* (2007) 41 Cal.4th 472, 508 [same].)

(2001) 25 Cal.4th 1124, 1134, for the proposition that "[c]rimes occurring after the charged offense cannot serve as predicate offenses to prove a pattern of criminal gang activity." (*Duran, supra,* 97 Cal.App.4th at p. 1458.)  These cases are of no assistance to Mota, however, because this evidence was not offered to establish a predicate offense. Rather it went to whether he was a gang member when the crimes were committed and his intentions in committing these crimes.

With regard to Mota's Evidence Code section 1101, subdivision (b) argument, "[c]ase law holds that where evidence of gang activity or membership is important to the motive, it can be introduced even if prejudicial.  [Citations.]" (*People v. Martin* (1994) 23 Cal.App.4th 76, 81; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369 -1370.)  Given that evidence of the circumstances and nature of this fight were directly relevant to Mota's motivation for committing the charged crimes, we find no error.

**J.      *Prosecutorial Misconduct***

**1.      *Absence of Evidence of Blood in Mota's Car***

Menendez testified that, while he was in Mota's car in mid-April 2008, he shot himself in the leg, causing significant bleeding.  About a month later, Mota's car was examined by the police.  This examination yielded no physical evidence to corroborate Menendez's story:  no blood, bullets or fingerprints were found.  The car contained a child seat and other baby items.

Mota's counsel argued, during closing argument, that because there was no evidence of a gun-inflicted injury in Mota's car, Menendez had lied when he testified about this incident.  Specifically, counsel told the jury that Mota's car "was seized, it was searched, and what was found in the car?  Absolutely no blood.  Not a single drop of blood.  [¶] No forensic evidence whatsoever, despite the car's having been seized and thoroughly searched.  Not a drop of blood."  Defense counsel went on: "And we all know you can't clean up blood.  And if you try to clean it up, you leave traces of chemicals."

The prosecutor objected on the ground that these were facts not in evidence.  The trial court sustained this objection, pointing out that defense counsel's assertion that an

55

effort to clean up blood leaves chemical traces, "is not either common knowledge or in evidence."

The prosecutor responded to defense counsel's argument regarding the absence of evidence of any blood from Menendez's self-inflicted wound. He told the jury that after Mota dropped Menendez off at the hospital, it "makes sense that he [Menendez] went to go clean it." The court overruled defense counsel's objection that there was "no evidence of that." The trial court noted that the general rule that "[c]ounsel are permitted to ask that the jury draw inferences from the evidence presented . . . ."

Defendants now argue that the prosecutor committed misconduct when he suggested that the reason there was no blood in the back of the car might have been that Mota cleaned up the blood. We reject this argument.

"The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214; *People v. Espinoza* (1992) 3 Cal.4th 806, 820.) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*People v. Espinoza, supra*, 3 Cal.4th at p. 820.)' (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) Regarding the scope of permissible prosecutorial argument, we recently noted ' " 'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.] 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " ' [citation], and he may 'use appropriate epithets . . . .' [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 221; *People v. Heishman* (1988) 45 Cal.3d 147, 195-

196 (*Heishman*) [counsel "prohibited from stating or implying facts for which there is no evidence before the jury."].)

The defense and the prosecutor presented the jury with different explanations for the lack of evidence of blood in Mota's car. Neither was implausible. Certainly, when there is an injury, particularly a gunshot wound, one might expect to find blood where the injury occurred. The fact that no blood was found in Mota's car lends itself to two inferences: that Menendez lied when he recounted the incident or Mota cleaned up the blood. What is important about both possibilities is that they amount to " ' "fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." ' " (*People v. Williams, supra,* 16 Cal.4th at p. 221.)

Nor is it the case, as defendant argues, that in asking the jury to infer that Menendez had cleaned the blood off the seat of his car, the prosecutor stated or implied facts "for which there is no evidence before the jury." (*Heishman, supra,* 45 Cal.3d at p. 195.) In *Heishman*, our Supreme Court found that the where a prosecutor implied a conclusion based on evidence in the record, no misconduct took place. As in *Heishman*, the prosecutor's argument was based on the facts before the jury—here, the fact that the car was devoid of blood.

We also reject defendant's argument that his Fifth and Fourteenth Amendment rights to a fair trial and due process were violated because the trial court sustained the prosecutor's objection to his statement regarding the chemical byproducts of cleaning up the blood, and overruled his objection in which the prosecutor suggested Menendez had cleaned the blood off the seat. The two statements were not "equivalent," as defendant contends. Nor did the trial court err when it allowed one and not the other.

## 2. *Disparagement of Defense Lawyer During Rebuttal*

Mota also argues that the prosecutor disparaged his truthfulness and integrity during rebuttal closing argument.

In the first alleged instance, the prosecutor told a story his grandfather, a farmer, told about a lawyer who was his neighbor. The farmer observed one day that the rope tying the goat in the lawyer's yard had been chewed through and the farmer's rose bushes

57

had been eaten. The farmer told the lawyer that the lawyer's goat had eaten his rose bushes. The lawyer told the farmer "It wasn't my goat. I don't have a goat. [¶] If I do have a goat, it didn't eat your roses. [¶] If I do have a goat and it did eat your roses, it's because the rose bushes made them eat the roses. [¶] If I do have a goat and it did eat your roses . . . then the goat was insane."

The prosecutor told the jury that this story illustrated that his grandfather "wasn't that happy that I was going to be a lawyer. And the point is, ladies and gentlemen, what are we here for? [¶] Are we here for the truth, or are we here just to throw everything out? What did you just hear from the defense for Mr. Mota? [¶] Well, ladies and gentlemen, you heard the following things: And it wasn't stated explicitly to you because [defense counsel] didn't want to come out and say that. [¶] How many defenses are there for Mr. Mota? I don't get it. My client wasn't there. He may not have been there for the 2-16 and 4-26 of '08 killings. [¶] If my client was there, he didn't know what these guys were going to do. [¶] If my client was there and he did know what they were doing, and it wasn't self-defense, it was imperfect self-defense so he is only guilty of voluntary manslaughter. [¶] If my client was there and he did know what they were doing and it wasn't self-defense or imperfect self-defense, then the bullets fired by Javier Gomez did not actually kill Rico McIntosh because you heard defendant Mota's attorney cross-examin[e] Mr. Ogan extensively. . . . [¶] If my client was there and he did know what they were doing and it wasn't self-defense or imperfect self-defense, and you do believe the bullets fired by Gomez actually killed Mr. McIntosh, then my client is only guilty of lesser-included offenses that aren't on the verdict forms, so he is not guilty."

In telling this story, the prosecutor did not commit misconduct. Pointing out the inconsistencies and implausibilities of an opponent's argument is not an attack on the opponent's personal integrity. (*People v. Medina* (1995) 11 Cal.4th 694, 759, *People v. Gionis, supra,* 9 Cal.4th at pp. 1217-1218.)

Similarly permissible was the prosecutor's characterization of defense counsel as a magician trying to trick the jury. In *People v. Medina, supra,* 11 Cal.4th at page 759, the court found that the prosecutor did not demean defense counsel's integrity when he told

the jury that " 'any experienced defense attorney can twist a little, poke a little, try to draw some speculation, try to get you to buy something . . . .' " The *Medina* court observed that "the prosecutor's . . . argument was unobjectionable. To observe that an experienced defense counsel will attempt to 'twist' and 'poke' at the prosecution's case does not amount to a personal attack on counsel's integrity." (See also *People v. Gionis, supra,* 9 Cal.4th at pp. 1217-1218.)

Accordingly, we find no prosecutorial misconduct and reject defendants' argument.

**K.** *Substantial Evidence of Murder and Conspiracy*

Elizalde was charged with conspiracy to commit murder and murder. The People characterized Elizalde as the conspirator who "stay[ed] home . . . and [did] nothing, but . . . started the design or agree[d] to the conspiracy . . . ." The People told the jury that the testimony of Ruelas, Sanchez and Cervantes showed that Elizalde "was leading a charge to attack rival gang members to bring the hood back." The People's theory was that the conspiracy to commit murder in which Mota and Elizalde participated had as its object the killing of rival gang members and the deaths of Centron, Perez and McIntosh were, therefore, the "natural and probable consequences of a conspiracy. . . ."

Elizalde now argues that substantial evidence does not establish that the murders of Centron, Perez and McIntosh were a foreseeable consequence of a conspiracy in which Elizalde and Mota participated.[34] We disagree.

---

[34] Elizalde also contends that the only evidence supporting his convictions is the uncorroborated testimony of accomplice witnesses. As we have previously held, four of the witnesses who testified regarding Elizalde's participation in a conspiracy that led to the murders of Centron, Perez and McIntosh were not, in fact, accomplices as a matter of law. Moreover, viewed in a light most favorable to the verdicts, the jury could have easily found that Valencia, Menendez, Cervantes and Ruelas were not accomplices and, thus, no corroboration was required. Finally, even if these witnesses were in fact accomplices, their testimony was adequately corroborated.

59

**1.** *General Principles*

In *People v. Johnson* (2013) 57 Cal.4th 250, 257, our Supreme Court recently explained that "[s]ection 182 prohibits a conspiracy by two or more people to 'commit any crime.' (§ 182, subd. (a)(1).) 'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy.' [Citations.]" "[I]it has long been established that direct evidence is not required to prove a common unlawful design and agreement to work toward a common purpose; the existence of a conspiracy may be inferred as well from circumstantial evidence. [Citations.]" (*People v. Buckman* (1960) 186 Cal.App.2d 38, 46-47; *People v. Calhoun* (1958) 50 Cal.2d 137, 144.) To the extent that a particular crime could be said to be "unplanned," a conspirator is responsible for it if it was a reasonably foreseeable consequence of the conspiracy. "Whether the unplanned act was a 'reasonably foreseeable consequence' of the conspiracy must be 'evaluated under all the factual circumstances of the individual case' and 'is a factual issue to be resolved by the jury' [citation], whose determination is conclusive if supported by substantial evidence." (*People v. Zielesch* (2009) 179 Cal.App.4th 731, 739-740.)

**2.** *Substantial Evidence of Conspiracy*

Our review of the record indicates that substantial evidence supports the jury's conclusion that (1) Elizalde conspired with Mota to reestablish Varrio Frontero Loco by, among other things, murdering rival gang members and (2) the deaths of Centron, Perez and McIntosh were the natural and probable consequence of that conspiracy.

Officer Brady of the San Pablo Police Department testified as a gang expert that in late 2007 and early 2008, Varrio Frontero Loco and the Mexican Locos were beginning to "clique up" together. Based on several murders that occurred as well as informant information, he believed that Gamaliel Elizalde was the "head shot-caller" of Varrio Frontero Loco. The gang was recruiting members and committing murders. He believed

60

Elizalde and other members of Varrio Frontero Loco were attempting to "reestablish the gang."

Sanchez testified that in the year leading up to the murders of Centron, Perez and McIntosh, Elizalde was the leader of Varrio Frontero Loco. The gang was on the decline—members were being hurt and territory was disappearing. To counteract this state of affairs, Elizalde, along with Sanchez, Mota, Ruelas, and others, began to recruit new members. They also embarked on a campaign to "do more damage to the Norteños." Elizalde encouraged Varrio Frontero Loco members to make sure that the Norteños were aware that they were a present and powerful force by going into Norteño territory to beat up or shoot anyone who appeared to be a Norteño. Menendez confirmed that this was, indeed, the understanding of the Varrio Frontero Loco members who "wanted to get rid of Norteños." Although Menendez was not sure, he believed that Elizalde was the "shot-caller." Ruelas confirmed Menendez's suspicion regarding Elizalde's role in the Varrio Frontero Loco. Ruelas also testified that Molina told him that they were "bringing the hood back" and violence against rival gang members was an important part of this effort.

In addition to substantial evidence that Elizalde was a significant player in a conspiracy to re-establish Varrio Frontero Loco as a powerful gang through violence—including murder—against Norteños, substantial evidence also supports the jury's conclusion that the deaths of Centron, Perez and McIntosh were the foreseeable consequence of the conspiracy to "bring[] the hood back." Centron, Perez and McIntosh were targeted because they appeared to be Norteños, the principal target of the Varrio Frontero Loco. Elizalde's argument that these murders were not foreseeable because the victims were outside Richmond, which was the area claimed by the Sureños, makes little sense. San Pablo was well known to be Norteño territory. Given that the Varrio Frontero Loco conspired to kill Norteños, they would generally do so in San Pablo, rather than Richmond.

The jury's verdict, therefore, is supported by substantial evidence.

**L.**     *Telephone Conversations Between Molina and His Mother*

Elizalde contends that portions of two telephone conversations—mainly between Hector Molina (who was in jail at the time of the conversations) and his mother—but also in one instance involving Elizalde, were improperly admitted under Evidence Code section 1223's co-conspirator's hearsay exception. We disagree.

**1.**     *Factual Background*

In the first of the two telephone calls, both of which occurred while he was incarcerated at the Martinez Detention Facility, Molina told his mother to contact Elizalde (Gama) and tell him "that they got me in." Hector's mother replied, "[b]ut you didn't do it, if you didn't do it!" and he replied "Well, yes, it was me. They already know." He told his mother to "Tell [Elizalde]. Ask [Elizalde] to help you. [Elizalde] can help you. [Elizalde] will give me money as well. Tell [Elizalde] I've told him to send me money." Molina asked his mother to place a "three way" call to Elizalde. When Elizalde did not answer, Molina left a message telling Elizalde that "they got me for murder" and that "I need you to take care of my family . . . [t]ake care of my mama . . . ."

In the second call, Molina's mother told him that Elizalde brought her $50. She also told him that Elizalde told her that Molina "should say no, no, no, I didn't do it, it couldn't have been me. I didn't do anything. To keep your word, and no, no, no." Molina's mother placed another three way call to Elizalde. This time, Elizalde answered. He instructed Molina, "whatever happened, you—you say that you don't know, okay man?" Molina responded, "Yeah, man." Elizalde then said "On your own, man, no. Just tell them no, you don't know and they can't get you out of that."

Elizalde sought to have evidence of these phone calls excluded on hearsay grounds. The People argued that they were admissible under the co-conspirator exception to the hearsay rule pursuant to Evidence Code section 1223. The trial court found that the People had "clearly made a prima facie case that the conspiracy described in the indictment existed. That the conspiracy was on-going in February and March of 2008 at the time of the phone calls. That Mr. Elizalde was a leader of VFL or a shot-caller for VFL and that Mr. Mota was a member of the conspiracy. And that Mr. Gomez

was also a member of the conspiracy." The court pointed out that Gomez's confession "can be considered as part of the prima facie case of his membership in the conspiracy." As Sureños, the "co-conspirators lived under a number of rules that are relevant to this analysis. [¶] First, is never cooperate with police. Never give a confession. Never give a statement. Never agree to testify. If you are arrested, fellow gang members will put money on your books to help you buy things in the jail which enables you to be more comfortable and to increase your influence at the jail. [¶] The Sureños in the jail were required to contribute money or buy things for other Sureños in custody. And then Sureños in custody were still required to assault Norteños at every opportunity. [¶] So the culture of attacking rival gang members did not stop upon arrest."

The court found that Molina was released following his arrest after the Centron murder and "within days" he "immediately returned to the active participation in the conspiracy. Just an indication that mere arrests [of conspiracy members] does not necessarily put their participation in the conspiracy at end." The court did, however, redact numerous telephone conversations in which Molina was "talking about his general welfare and that sort of thing."

### 2. *Discussion*

Defendant argues that the trial court erred when it found that the conspiracy was ongoing. He contends that because Molina had already been arrested when the telephone calls were made, the court could not conclude that he was involved in an ongoing conspiracy.

We review the trial court's ruling under the abuse of discretion standard and will not disturb it on appeal unless it was exercised in a manner that was arbitrary, capricious, or patently absurd and that resulted in a miscarriage of justice. (*People v. Rowland* (1992) 4 Cal.4th 238, 264.) The trial court did not abuse its discretion in admitting the excerpts from these telephone calls.

Evidence Code section 1223 provides that "a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in

furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

As the proponent of the evidence, the People were required to "offer evidence sufficient for the trier of fact to determine that the preliminary fact, the conspiracy, is more likely than not to have existed." (*People v. Herrera* (2000) 83 Cal.App.4th 46, 61.) The *Herrera* court explains that "[a] conspiracy exists when one or more persons have the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act by one or more of the parties to such agreement in furtherance of the conspiracy. [Citations.] These facts may be established through the use of circumstantial evidence. [Citations.] They may also ' "be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]" ' [Citations.] [¶] Once the existence of the conspiracy has been independently established, the offering party must then make three additional showings in order for the content of the coconspirator's statement to be considered by the trier of fact. That party must show: (1) that the declarant (who may or may not be the defendant) was participating in a conspiracy at the time of the declaration; (2) that the declaration was made in furtherance of the objective of the conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating, or would later participate, in the conspiracy. [Citations.]" (*Id.* at pp. 64-65.)

We turn now to this case. The court had before it evidence that when the telephone calls were made—in February and March of 2008—Elizalde, who was not in custody at the time, was the shot caller for Varrio Frontero Loco. Even in custody, a Sureño like Molina adhered to rules of behavior established by the gang. As the trial court put it: "First, is never cooperate with police. Never give a confession. Never give a statement. Never agree to testify. If you are arrested, fellow gang members will put money on your

64

books to help you buy things in the jail which enables you to be more comfortable and to increase your influence at the jail. [¶] The Sureños in the jail were required to contribute money or to buy things for other Sureños in custody." Contrary to defendant's argument that the conspiracy among the parties to attack Norteños ended when Molina was arrested, the court found that "Sureños in custody were still required to assault Norteños at every opportunity. [¶] So the culture of attacking rival gang members did not stop upon arrest." In fact, when Molina was released following his arrest after the Centron murder, "within days" he "immediately returned to the active participation in the conspiracy. Just an indication that mere arrests [of conspiracy members] does not necessarily put their participation in the conspiracy at end."

This evidence was sufficient to support a finding that it was more likely than not that Molina and Elizalde were participants in a conspiracy when the telephone calls were made and, therefore, the telephone calls were properly admitted.

## M. *Ineffective Assistance of Counsel*

The short answer to Elizalde's argument that counsel was deficient for failing to object to the admission of these telephone calls is that because (as we previously found) this evidence was admissible, any objection would have been unavailing and, thus, the failure to object did not constitute ineffective assistance of counsel. (*People v. Frye* (1998) 18 Cal.4th 894, 952, overruled on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

## N. *Ruelas's MySpace Post*

Luis Ruelas testified that he posted a message on his MySpace page in order to warn gang members not to harm his family. The gist of the message was that if gang members "touch my family their family can be touched, too." The post read as follows: "but dis goes to all da lil homies, stop listening to da big homies, they dnt give a fuck bout ya lil niggas, dnt listen to Stranger, dat nigga is a nobody in VFL. Just cus hes close to Gama dnt mean shit. He never did no, jales . . . and Gama just uses ya to take care of his shit. He dnt give a fuck bout ya." He posted that the true members of VFL were

65

"Sleepy, Richy, Toby, Ruelas, Camacho, all da other VFLs except da pee wees are fucken suckas niggas."

The trial court instructed the jury pursuant to CALJIC No. 3.13 that "[t]he required corroboration of the testimony of an accomplice may not be supplied by the testimony of any or all of his accomplices, but must come from other evidence." Elizalde argues that the instruction was incorrect because the jury could have understood it to mean that Ruelas's accomplice testimony could be corroborated by his MySpace post because that post might be considered "non-testimonial."

Even if Elizalde had not forfeited this claim because he did not object or request a modification to the instruction, his claim is without merit. We do not agree that the instruction could be construed as permitting the jury to use the MySpace post as corroboration. The language of the instruction is broad enough to encompass this particular communication. The instruction, therefore, did not violate his Sixth Amendment right to make a defense. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.)

## O.    *Elizalde's 2007 Methamphetamine Incident*

As part of its showing of a predicate offense for the gang charge and gang enhancements, the People put in evidence of an incident involving Elizalde's 2007 possession of methamphetamine for sale. Elizalde objected to the admission of this evidence under Evidence Code section 352. He argued then, as he does now on appeal, that the evidence was cumulative and more prejudicial than probative. The trial court did not abuse its discretion in admitting the evidence.

At trial, two police officers testified that they searched Elizalde's home on July 18, 2007. During that search, the officers discovered a trail of white crystals, which were later identified as methamphetamine, leading from a bathroom to where Elizalde was standing. In addition, the officers found the same white crystals around the top of the toilet bowl rim, on the floor of the bathroom, and on Elizalde's abdomen. The officers also found indicia that Elizalde was selling drugs. These included small Ziploc baggies, a digital scale, $755 cash in Elizalde's pocket and "pay/owe" sheets. One of the officers, who was qualified as an expert on the possession of narcotics for sale testified that in his

66

opinion Elizalde possessed methamphetamine for sale and flushed it down the toilet. Elizalde was arrested for possession of narcotics for sale and ultimately was convicted of only possession.

The trial court admitted evidence of Elizalde's conduct on this occasion to meet the predicate crime requirements, finding that "the probative value is very high because they are legitimate proof of essential elements of the crime and enhancements." With regard to the prejudicial effect of this evidence, the court found that although the prejudicial effect of the evidence was substantial, a limiting instruction could mitigate that effect.[35]

The trial court did not abuse its discretion in admitting this evidence. Our Supreme Court recently considered a similar objection to gang evidence admitted to prove a predicate offense under section 186.22. The court explained that, in contrast to evidence admitted under Evidence Code section 1101 to show intent, motive or modus operandi, in which " 'evidence is probative because of its tendency to establish an *intermediary fact* from which the ultimate fact of guilt of a charged crime may be inferred. [Citations.]' In prosecutions for active participation in a criminal street gang, the probative value of evidence of a defendants gang-related separate offense generally is greater because it provides direct proof of several ultimate facts necessary to a conviction. Thus, that the defendant committed a gang-related offense on a separate occasion provides direct evidence of a predicate offense, that the defendant actively participated in the criminal street gang, and that the defendant knew the gang engaged in a pattern of criminal gang activity." (*People v. Tran* (2011) 51 Cal.4th 1040, 1048.) Not

---

[35] The court did indeed give the jury limiting instructions regarding this evidence. After the two officers who searched Elizalde's house testified, the court instructed the jury that their testimony regarding Elizalde's possession of methamphetamine for sale was admissible only with regard to the gang count and gang enhancements. The court warned the jury that the evidence was "not admissible to suggest the Mr. Elizalde . . . has a bad character or a propensity to commit crimes, buy only on the predicate act elements of the gang charge and the gang enhancements . . . ." At the end of the trial, the court instructed the jury on the use of evidence that was admitted for a limited purpose (CALJIC No. 2.09) and evidence of other crimes (CALJIC No. 2.50).

only is such evidence highly probative, but its prejudicial effect is comparatively weaker: "[T]he inherent prejudice from a defendant's separate gang-related offense typically will be less when the evidence is admitted to establish a predicate offense in a prosecution for active participation in a criminal street gang, than when it is admitted to establish an intermediary fact from which guilt may be inferred. 'Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt.' [Citations.] As we explained in *People v. Doolin* (2009) 45 Cal.4th 390: ' "The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' " ' (*Id*. at p. 439.) That the evidence provided direct evidence of some of the elements of the prosecution's case thus does not weigh against its admission. In addition, because the prosecution is required to establish the defendant was an active participant in a criminal street gang and had knowledge of the gang's criminal activities, the jury inevitably and necessarily will in any event receive evidence tending to show the defendant actively supported the street gang's criminal activities. That the defendant was personally involved in some of those activities typically will not so increase the prejudicial nature of the evidence as to unfairly bias the jury against the defendant. In short, the use of evidence of a defendant's separate offense to prove a predicate offense should not generally create 'an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' [Citation.]" (*People v. Tran, supra,* 51 Cal.4th at p. 1048.)

The *Tran* court also addressed the contention Elizalde makes that evidence of his possession of narcotics for sale was cumulative of the evidence of other predicate offenses offered by the prosecution. "Defendant argues that evidence of a defendant's separate offense on another occasion should not be admitted when it is 'cumulative.' By this he seems to mean that the evidence should not be admitted when the prosecution has the ability to develop evidence of offenses committed on separate occasions by other

68

gang members. But defendant cites no authority for the argument that the prosecution must forgo the use of relevant, persuasive evidence to prove an element of a crime because the element might also be established through other evidence. The prejudicial effect of evidence defendant committed a separate offense may, of course, outweigh its probative value if it is merely cumulative regarding an issue not reasonably subject to dispute. [Citations.] But the prosecution cannot be compelled to ' "present its case in the sanitized fashion suggested by the defense." ' [Citation.] When the evidence has probative value, and the potential for prejudice resulting from its admission is within tolerable limits, it is not unduly prejudicial and its admission is not an abuse of discretion. Further, a rule requiring exclusion of evidence of a defendant's separate offense on the theory the prosecution might be able to produce evidence of offenses committed by other gang members would unreasonably favor defendants belonging to large gangs with a substantial history of criminality. That the prosecution might be able to develop evidence of predicate offenses committed by other gang members therefore does not require exclusion of evidence of a defendant's own separate offense to show a pattern of criminal gang activity." (*People v. Tran, supra,* 51 Cal.4th at pp.1048-1049.)

In our view, the evidence of Elizalde's conduct on this occasion was not so prejudicial as to preclude its admission. The jury had before it evidence of numerous acts of violence committed by Elizalde and, in that context, evidence that he possessed methamphetamine for sale can hardly be considered sufficiently prejudicial to outweigh its substantial probative value.

**P.** *Ineffective Assistance of Counsel For Failure to Object to "Other Crimes" Evidence*

Elizalde argues that counsel was ineffective because he did not object to the introduction of evidence of Elizalde's role in a number of crimes. He contends that this evidence was "devastating," and therefore counsel's failure to object violated the Sixth Amendment.

The evidence to which counsel did not object was: (1) testimony that Elizalde directed Sanchez and Ruelas to kill a surviving witness to the Centron shootings; (2)

69

evidence that "Weasal" who was a Varrio Frontero Loco shot caller from prison ordered Elizalde to kill an informant and that although Elizalde did not want to do so, he sent someone to burn the informant's house down; (3) the fact that Elizalde kept a hit list of people whom he wanted killed and kept a stash of guns at his brother-in-law's house; (4) Ruelas's description of an incident in which Elizalde asked Ruelas to kill someone who had slashed his tires; and (5) Ruelas's opinion that Elizalde was killing people "for no reason" and that he tried to persuade Elizalde to stop ordering so many shootings.

This evidence was highly relevant to establish Elizalde's position as the Varrio Frontero Loco shot caller and his participation in the conspiracy to kill Norteños. Moreover, given the amount of evidence of similar activity on Elizalde's part it was not more prejudicial than probative under Evidence Code section 352. Any objection counsel might have made regarding the admission of this evidence would have been unavailing. In that case, the failure to object does not constitute ineffective assistance of counsel. (*People v. Frye, supra,* 18 Cal.4th at p. 952.)

## Q.    *Cumulative Error (Elizalde)*

Elizalde contends cumulative error in this case rises to the level of reversible and prejudicial error. (*People v. Hill* (1998) 17 Cal.4th 800, 844, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) We disagree. The single error in this matter regarding the admission of Mota's booking statement cannot amount to cumulative error because, along with being the sole error in this case, it was harmless.

## IV.  DISPOSITION

The judgments are affirmed.

70

                                   _____

                                   Haerle, Acting P.J.

We concur:


_____

Richman, J.


_____

Brick, J.*


       * Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 12/19/13

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>GAMALIEL ELIZALDE, et al.,<br><br>      Defendants and Appellants. | A132071<br><br>(Contra Costa County<br>Super. Ct. No. 050809038) |

BY THE COURT:

The opinion filed on November 19, 2013, is hereby modified as follows:

Regarding the Petition for Rehearing of defendant Gomez:

The parenthetical contained in the third line of the second paragraph on page two shall be revised to read "(Elizalde joins in this argument)".  The parenthetical on the eleventh line of the second paragraph on page two shall be revised to read "(Elizalde joins in this argument)".

These modifications do not effect a change in the judgment.

Defendant Gomez's Petition for Rehearing is denied.

Regarding the Petition for Rehearing of defendant Mota:

On page 35 of the opinion in the second paragraph, line 4 "First" should be changed to "In our view,".

The third paragraph beginning with "The People" should be deleted.

These modifications do not effect a change in the judgment.

Defendant Mota's Petition for Rehearing is denied.

1

Regarding the Petition for Rehearing of defendant Elizalde:

On page 65 of the opinion, subsection II.M. should be deleted and replaced with the following paragraph:

"Elizalde argues that counsel was deficient for failing to seek redaction of Mota's mother's statement 'Uh, my god, but [Elizalde] says that you should—you should say no, no, no . . . .'  However, this evidence was admissible under the party admission exception for Elizalde's statement and as an excited utterance by Mota's mother.  Therefore, any objection would have been unavailing and, thus, the failure to object did not constitute ineffective assistance of counsel.  (*People v. Frye* (1998) 18 Cal.4th 894, 952, overruled on other grounds by *People v. Doolin* (2009 45 Cal.4th 390, 421, fn.22.)"

This modification does not effect a change in the judgment.

Defendant Elizalde's Petition for Rehearing is denied.


Date:  _____          _____
                                        Haerle, Acting P.J.




A132071, *People v. Elizalde et al.*

2

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>GAMALIEL ELIZALDE et al.,<br><br>    Defendants and Appellants. | A132071<br><br>(Contra Costa County<br>Super. Ct. No. 050809038) |

BY THE COURT:

The opinion in the above-entitled matter filed on November 19, 2013, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports with the exception of parts III A through F and H through Q and it is now so ordered.

Dated: _____          _____
                                                             Haerle, Acting P.J.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III A through F and H through Q.

Trial Court:  Superior Court of Contra Costa County

Trial Judge:  Hon. John Kennedy

| | |
|---|---|
| Attorney for Appellant Gamaliel Elizalde | Solomon Wollack<br>By Appointment of the Court of Appeal<br>under the First District Appellate Project<br>Independent Case System |
| Attorney for Appellant Jose Mota | Stephen B. Bedrick<br>By Appointment of the Court of Appeal<br>under the First District Appellate Project<br>Independent Case System |
| Attorney for Appellant Javier Gomez | John Ward<br>By Appointment of the Court of Appeal<br>under the First District Appellate Project<br>Independent Case System |
| Attorneys for Respondent The People | Kamala D. Harris<br>Attorney General<br>Dane R. Gillette<br>Chief Assistant Attorney General<br>Gerald A. Engler<br>Senior Assistant Attorney General<br>Rene A. Chacon<br>Supervising Deputy Attorney General<br>David M. Baskind<br>Deputy Attorney General |

A132071  *People v. Elizalde et al.*